**UNITED STATES of America**

v.

**Irving Ronald KATZ, Albert Charles Hamilton, Warren Smith, Defendants.**

**No. 80 CR 432.**

United States District Court, E. D. New York.

March 9, 1981.

Edward R. Korman, U. S. Atty., E. D. New York, for United States by Reena Raggi, Asst. U. S. Atty., Brooklyn, N. Y.

Flamhaft, Levy, Kamins & Hirsch, Brooklyn, N. Y., for defendant Katz by Harold L. Levy, Brooklyn, N. Y.

## MEMORANDUM AND ORDER

NEAHER, District Judge.

The defendant Irving Katz and two co-defendants were charged with conspiracy to manufacture phenyl-2-propanone ("P2P") and to possess it with intent to manufacture methamphetamine and with the manufacture of P2P.[1] Contending that the involvement of a government agent and an informant in the commission of the acts for which he was indicted was so extensive as to deny him due process of law and thereby constitute a bar to further prosecution, defendant Katz has moved to dismiss the indictment. For the purposes of this motion only, the court will accept as true the allegations in defendant's motion papers.

Defendant alleges that in May or June of 1980 he noticed the following advertisement in "High Times" magazine:

"CHEMISTS—GET THE DEA'S 'Watched List of Chemicals Used to Produce Controlled Substances.' Avoid suspicion by ordering any of 93 chemicals from acetic anhydride to urea. Our *new* chemical catalog is included with many interesting items. Send $10 to: BUCKEYE SCIENTIFIC CO., P.O. Box 27176A, Columbus, OH 43227" (Exh. 1 to Levy Aff., February 11, 1981.)

He further alleges:

"I responded to this advertisement in order to purchase some chemicals, and I received a telephone number for Richard Hall, purportedly the President of Buckeye Chemical. I called Mr. Hall on the telephone and told him *I was interested in purchasing P2P.* Mr. Hall said that he did not sell this product but there were other ways of getting it and he urged me to come out to Columbus, Ohio to meet him to discuss this in person." (Katz Aff., February 11, 1981; emphasis supplied.)

Defendant flew to Ohio where Hall gave him a formula for the manufacture of P2P and sold defendant the necessary chemical ingredients. Defendant also received a catalogue that contained a preface in the form of a letter from Hall as president of Buckeye. This letter gave advice to potential customers who would seek to avoid the attentions of law enforcement officials. The letter also appeared to imply that Hall's company, unlike some other chemical supply houses, did not notify the Drug Enforcement Administration ("DEA") of requests for or purchases of "DEA Watched Substances."

Upon defendant's failure successfully to manufacture P2P in New York, he returned to Ohio at Hall's suggestion to visit the Ohio State University Chemistry Library with Hall to ascertain the correct formula. Defendant made further purchases of chemicals from Hall and returned again to New York. After defendant's second failure and yet another trip to Ohio, Hall introduced defendant to a man he identified as a friend and chemist who could advise defendant on the manufacture of P2P. Both Hall and the chemist told defendant that P2P "was a controlled substance and was, therefore, illegal."

Defendant and the chemist returned to New York and later travelled to a supply company in New Jersey where the latter advised defendant regarding the purchase of equipment needed for the production of P2P. The chemist gave defendant and a co-defendant "explicit instructions" with regard to the manufacture of P2P and later repeated these by telephone to the co-defendant who allegedly had begun the experiment to produce the controlled substance.

---

1. Phenyl-2-propanone, an essential ingredient in the manufacture of methamphetamine, a Schedule II controlled substance, see *Hampton v. United States*, 425 U.S. 484, 492 n. 1, 96 S.Ct. 1646, 1651 n. 1, 48 L.Ed.2d 113 (1976), has itself been a Schedule II controlled substance since January 1980.

It appears from the complaint in this case that defendant was arrested soon after the success of this final experiment was announced by the co-defendant.

Defendant alleges that Hall, who has since died, was in fact a paid informant who regularly reported Buckeye sales and shipments of certain chemicals to the DEA. In addition, it is alleged that the chemist was actually a DEA undercover agent. It is defendant's position on this motion that although he is

> "not raising any defense of entrapment, acknowledging a predisposition on the part of the defendant to commit the crime," (Defendant's Memo. at 5–6)

nonetheless the activities of Hall and the DEA chemist were

> "so inexorably linked and intertwined with the commission of this crime and became a moving force in it to the extent that their conduct constituted serious over-reaching by the government and requires a dismissal of the indictment." (Levy Aff. at 2.)

Accepting defendant's allegations as stated, the court is of opinion that even if they were proved true, they would not suffice to constitute a denial of due process sufficient to require dismissal of the indictment. Accordingly, no hearing is necessary and the motion is denied.

The contention that alleged government overinvolvement in the events leading up to defendant's indictment amounts to a denial of due process is extrapolated from language in the concurrence in *Hampton v. United States*, 425 U.S. 484, 491, 96 S.Ct. 1646, 1651, 48 L.Ed.2d 113 (1976) (Powell, J., concurring). In *Hampton*, Justice Powell was reluctant to hold with the plurality of three members of the Court that predisposition to commit a crime—which clearly forecloses the traditional defense of entrapment, *Hampton, supra*, 425 U.S. at 488–89, 493 n.2, 96 S.Ct. at 1648–49, 1651 n.2 is also dispositive of *every* defense based upon alleged government overinvolvement in the commission of a crime. The concurrence suggested that due process principles or an appellate court's supervisory powers conceivably "could support a bar to conviction" in cases of outrageous conduct on the part of law enforcement officials. Justice Powell, however, stated clearly that *Hampton* was not such a case, and he was careful to

> "emphasize that the cases, if any, in which proof of predisposition is not dispositive will be rare. Police overinvolvement in crime would have to reach a demonstrable level of outrageousness before it could bar conviction. This would be especially difficult to show with respect to contraband offenses, which are so difficult to detect in the absence of undercover Government involvement. One cannot easily exaggerate the problems confronted by law enforcement authorities in dealing effectively with an expanding narcotics traffic, cf. *United States v. Russell*, [411 U.S. 423, 432, 93 S.Ct. 1637, 1643, 36 L.Ed.2d 366 (1973)] . . . which is one of the major contributing causes of escalating crime in our cities." *Hampton, supra*, 425 U.S. at 495 n.7, 96 S.Ct. at 1653 n.7.

*United States v. Russell, supra*, provides an important backdrop against which claims of government overreaching in the area of narcotics investigations should be viewed:

> "The illicit manufacture of drugs is not a sporadic, isolated criminal incident, but a continuing, though illegal, business enterprise. In order to obtain convictions for illegally manufacturing drugs, the gathering of evidence of past unlawful conduct frequently proves to be an all but impossible task. Thus in drug-related offenses law enforcement personnel have turned to one of the only practicable means of detection: the infiltration of drug rings and a limited participation in their unlawful present practices. Such infiltration is a recognized and permissible means of investigation; if that be so, then the supply of some item of value that the drug ring requires must, as a general rule, also be permissible. For an agent will not be taken into the confidence of the illegal entrepreneurs unless he has something of value to offer them. Law enforcement tactics such as this can

hardly be said to violate 'fundamental fairness' or 'shocking to the universal sense of justice,' *Kinsella [v. United States ex rel. Singleton,* 361 U.S. 234, 246, 80 S.Ct. 297, 304, 4 L.Ed.2d 268 (1960).]" 411 U.S. at 432, 93 S.Ct. at 1643.

It is with these principles in mind that the court has considered defendant's allegations. It may be that the magazine advertisement and Hall's preface in the Buckeye catalogue were misleading to the extent that they suggested that those engaged in illicit activities could do so through Buckeye without fear of DEA detection. However, defendant makes no claim—and it is doubtful that he could—that Hall was in the employ of the DEA and published these advertising materials for the specific purpose of snaring defendant. See *United States v. Cuomo,* 479 F.2d 688, 692 & n.2 (2d Cir.), *cert. denied,* 414 U.S. 1002, 94 S.Ct. 357, 38 L.Ed.2d 238 (1973). Compare *Williamson v. United States,* 311 F.2d 441 (5th Cir. 1962) (government offered informant specific sums of money for apprehension of specific individuals). The court is unable to say that the "artifice and stratagem" in this case overstepped the bounds of propriety long recognized by the courts as necessary to effective law enforcement. *Sorrells v. United States,* 287 U.S. 435, 441, 53 S.Ct. 210, 212, 77 L.Ed. 413 (1932). See *United States v. Russell, supra; United States v. Corcione,* 592 F.2d 111, 115 (2d Cir.), *cert. denied,* 440 U.S. 975, 985, 99 S.Ct. 1545, 1801, 59 L.Ed.2d 794 (1979).

Moreover, defendant's own affidavit demonstrates that it was he who made the initial contact with Hall, having previously formed the intention to engage in illegal activity. Although Hall allegedly encouraged defendant to travel to Ohio, the absence of any claim of inducement on Hall's part makes defendant's claim of misconduct even weaker than that rejected by the court in *United States v. Nunez-Rios,* 622 F.2d 1093 (2d Cir. 1980), where the defendant asserted that a DEA informant had paid him to engage in the narcotics activity for which he was arrested and indicted. In the light of defendant's apparent persistence and eagerness to obtain P2P, a substance not mentioned in Hall's advertisement, it can hardly be said that Hall instigated the commission of the crime itself and "deceptively implanted the criminal design in [defendant's] mind." *United States v. Twigg,* 588 F.2d 373, 381 (3d Cir. 1978).[2]

Regarding Hall's alleged involvement in the manufacture of narcotics here, it is significant that there is no claim that he supplied defendant with any controlled substance. Thus, the assertion that providing the *corpus delicti* in itself constitutes excessive governmental involvement—rejected in *Hampton, Nunez-Rios* and *Corcione, supra* —cannot be made by defendant. Rather, he alleges no more than that Hall and the DEA chemist advised him on the purchase of laboratory equipment,[3] and gave detailed instructions without which defendant and his co-defendants would have been unable to manufacture P2P or methamphetamine. It should be observed, as it was in *United States v. Russell, supra,* 411 U.S. at 431, 93 S.Ct. at 1642, that all of the assistance supplied to defendant could have been obtained legally from other sources.[4] At

---

**2.** This case may be further distinguished from *Twigg,* the product of a sharply split panel of the Third Circuit. In *Twigg,* an informant, at the direction of the DEA, contacted the defendant, who at that time had not been engaged in any illicit narcotics activity, for the express purpose of establishing a laboratory to manufacture methamphetamine. Thereafter, the informant, using DEA funds, underwrote the operation, going as far as gratuitously providing necessary equipment and renting an isolated farmhouse appropriate for the covert manufacture of illegal drugs. Finally, the informant was completely in charge of the laboratory and

personally conducted the experiments, receiving only minor assistance from the defendant.

**3.** It appears from defendant's affidavit that the chemist merely advised him on purchases made with defendant's own funds. There is no allegation that the chemist supplied defendant with monies for these purchases. Compare *United States v. Twigg, supra.*

**4.** In this regard, the court notes the government's assertion—without relying on it as support for today's decision—that at trial it will prove defendant purchased over two thousand dollars worth of chemicals and laboratory

most, this participation amounts to facilitation far less extensive than that approved in *United States v. Corcione, supra,*[5] where the government informant bought and took delivery of heroin in Bangkok, advised the defendant how to smuggle the drugs into the United States, and, in fact, carried the suitcase containing the drugs onto the airplane.

Hall's and the DEA chemist's advice and instruction, even if as extensive and absolutely essential as defendant asserts, must be considered permissible law enforcement activities when viewed in the light of the Supreme Court's recognition

> "that the practicalities of combatting the narcotics traffic frequently require law enforcement officers legitimately to supply 'some item of value that the drug ring requires." *Hampton v. United States, supra,* 425 U.S. at 491, 96 S.Ct. at 1651 (Powell, J., concurring), quoting *United States v. Russell, supra,* 411 U.S. at 432, 93 S.Ct. at 1643.

In sum, if all of defendant's allegations were proved true, this court would be forced to conclude, as did the court in *Corcione, supra,* that the government's participation here, far from being outrageous or offensive, represented an example of effective law enforcement work which resulted in the apprehension of one who was not only predisposed, but had at least already formed the specific intention, to violate federal narcotics law. Accordingly, the motion is denied.

So ordered.

---

equipment from a New Jersey chemical supply firm well before he contacted Hall at Buckeye Scientific Co.

**5.** "In short, the Government's participation here, far from being outrageous or offensive, represented an example of effective law en-

forcement work, without which appellants, already embarked upon a large-scale heroin operation, could not have been brought to bay." *United States v. Corcione, supra,* 592 F.2d at 115.