**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Thomas C. TOBIAS,
Defendant-Appellant.**

No. 80–7561.

United States Court of Appeals,
Fifth Circuit.*
Unit B

Nov. 30, 1981.

Rehearing Denied Jan. 18, 1982.

* Former Fifth Circuit case, Section 9(1) of Public Law 96–452—October 14, 1980.

Augusta E. Wilson, Mobile, Ala. (Court-appointed), for defendant-appellant.

William A. Kimbrough, U. S. Atty., Ginny S. Granade, Asst. U. S. Atty., Mobile, Ala., for plaintiff-appellee.

Before FRANK M. JOHNSON, Jr. and HATCHETT, Circuit Judges, and SCOTT **, District Judge.

## HATCHETT, Circuit Judge:

We again examine the extent to which the government may become involved in a criminal enterprise without being found guilty of entrapment or having its conduct declared so outrageous as to violate a criminal defendant's due process rights under the fifth amendment. Finding the government's conduct in this case to be within lawful bounds, we affirm, but remand for resentencing.

## FACTS

In order to pursue undercover investigations of clandestine laboratory operators, the Drug Enforcement Administration (DEA), established a chemical supply company in a mid-western state which shall be known herein as the supply company. The supply company operated in the same way as any legitimate chemical supply company.

** Honorable Charles R. Scott, U. S. District Court Judge for the Middle District of Florida,

It had a business location and received orders via telephone and mail for various chemicals which could be used in the manufacture of controlled substances.

In the April 1980 edition of *High Times Magazine*, the DEA supply company placed an advertisement offering over-the-counter sales of chemicals and laboratory equipment. On March 18, 1980, supply company received a letter from Thomas C. Tobias, the defendant, requesting "more information" and giving his name and address. A catalog was sent to Tobias in Mobile, Alabama. On March 26, 1980, Tobias telephoned the supply company and placed an order for various chemicals. On April 15, 16, 17, and 24, 1980, Tobias telephoned the supply company to check on his order and to order additional chemicals. During the April 24 telephone conversation, an agent told Tobias that the chemicals had been shipped. In fact, the chemicals had not been shipped.

On April 25, 1980, Tobias again called the supply company about his order. According to Tobias's testimony, he telephoned to cancel his order because he had discovered from reading drug literature that he could not manufacture cocaine without "more knowledge . . . and a lot of equipment." Before Tobias could cancel his order, however, Special Agent Schabilion asked him what he was trying to do. Tobias admitted that he wanted to make cocaine but had encountered difficulties. Pretending to empathize with Tobias, Schabilion stated that he too found cocaine to be extremely difficult and expensive to manufacture. To this, Tobias said he was not necessarily interested in manufacturing cocaine, but "just wanted to make some money." Agent Schabilion advised Tobias that "almost anything would be cheaper and easier to manufacture than cocaine," including amphetamines. Schabilion then suggested that Tobias make Phencyclidene (PCP). Schabilion explained that making PCP was as easy as "baking a cake" and that for $500 he would

sitting by designation.

send Tobias everything he needed to get set up. Stating that he might have a market for PCP in Mobile, Tobias agreed. He cancelled his order for the original chemicals and told Special Agent Schabilion to send him everything he needed to manufacture PCP.

The supply company shipped the formula and some of the chemicals needed to manufacture PCP to the DEA office in Mobile for delivery to Tobias. It is undisputed that the chemicals provided by the DEA were not difficult to obtain and could have been purchased at other chemical supply houses. After receiving the chemicals and formula from the DEA, Tobias telephoned the supply company thirteen times to discuss problems encountered in the manufacturing process and to obtain advice for overcoming them. On May 9, 1980, when DEA agents executed a search warrant on Tobias's residence in Mobile they found PCP in a liquid state.

Tobias was convicted in a non-jury trial of conspiracy to manufacture and possess Phencyclidine (PCP) with intent to distribute in violation of 21 U.S.C. § 846,[1] manufacturing PCP, and possession with intent to distribute PCP, both in violation of 21 U.S.C. § 841(a)(1).[2] Tobias received sentences totaling fifteen years in prison.

In this appeal, Tobias contends (1) that the district court erred in refusing to grant a judgment of acquittal based on his defense of entrapment, (2) that the government's involvement in this criminal enterprise was so outrageous as to violate the due process clause of the fifth amendment, and (3) that the absence of a finding in the record that Tobias's waiver of trial by jury was made intelligently and understandingly constitutes reversible error, and (4) that he was improperly sentenced.

## I.

Tobias complains that the record is devoid of any evidence indicating that he entertained the thought of making drugs prior to reading the government's advertisement for chemicals. He also argues that even after he sought to abandon his scheme to manufacture cocaine, the DEA agents suggested that he make a "cheaper and easier" drug and provided him with the necessary precursors, equipment, and know-how. Thus, he argues that he was entrapped as a matter of law.

■ "[W]hen entrapment is at issue, the focal point of the inquiry is on the predisposition of the defendant." *United States v. Webster*, 649 F.2d 346 at 348 (5th Cir. 1981) (*en banc*); *United States v. Russell*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973); *United States v. Reyes*, 645 F.2d 285 (5th Cir. 1981). Thus, a defendant who wishes to assert an entrapment defense must initially come forward with evidence "that the Government's conduct created a substantial risk that the offense would be committed by a person other than one ready to commit it." *United States v. Dickens*, 524 F.2d 441, 444 (5th Cir. 1975), *cert. denied*, 425 U.S. 994, 96 S.Ct. 2208, 48 L.Ed.2d 819 (1976) (quoting *United States v. Mosley*, 496 F.2d 1012, 1014 (5th Cir. 1974)). Once the defendant has carried this burden, the government must, if it is to prevail, prove beyond a reasonable doubt that the defendant was predisposed to commit the crime charged. *United States v. Dickens.*

"A prosecution cannot be defeated merely because a government agent has provided the accused with the opportunity or facilities for the commission of the crime." *United States v. Williams*, 613 F.2d 560, 562 (5th Cir. 1980) (citing *United States v. Dickens*, 524 F.2d 441 (5th Cir. 1975), *cert. de-*

---

1. 21 U.S.C. § 846 provides:

   Any person who attempts or conspires to commit any offense defined in this subchapter is punishable by imprisonment or fine or both which may not exceed the maximum punishment prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

2. 21 U.S.C. § 841(a)(1) provides:

   Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—
   to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance
   . . . .

*nied,* 425 U.S. 994, 96 S.Ct. 2208, 48 L.Ed.2d 819 (1976)). "It is only when the government's deception actually implants the criminal design in the mind of the defendant that the defense of entrapment comes into play." *United States v. Russell,* 411 U.S. 423, 436, 93 S.Ct. 1637, 1645, 36 L.Ed.2d 366 (1973).

On this record, we cannot say that Tobias was entrapped. Even assuming Tobias produced sufficient evidence to raise the issue of entrapment, we are satisfied that the government carried its burden of proving, beyond a reasonable doubt, that Tobias was predisposed to commit the charged offenses. The government's proof showed that Tobias responded to a simple advertisement offering the over-the-counter sale of chemicals which could be purchased without any difficulty in chemical houses in Mobile, Alabama. This advertisement served only to provide one so disposed the opportunity to obtain the necessary precursors and equipment to manufacture controlled substances. Tobias seized this opportunity by writing the supply company for "more information" and telephoning the supply company on many occasions to place and check on his order. The DEA did nothing else to solicit Tobias's business. A prosecution may not be defeated because the government provides the accused with the opportunity to commit the crimes charged. *Williams,* 613 F.2d at 562.

Tobias also contends that agent Schabilion's suggestion that PCP would be "cheaper and easier" to manufacture implanted the criminal design in his mind at a time when he sought to cancel his order for chemicals necessary to manufacture cocaine.

The record simply does not bear out Tobias's contention. The record shows that although Tobias sought to cancel his original order, he indicated to agent Schabilion that he was not interested in manufacturing any particular drug but was only interested in making money. At that point, agent Schabilion suggested that amphetamines, including PCP, would be "cheaper and easier" to manufacture. Tobias then indicated that there might be a market for PCP in Mobile and asked Schabilion to send him the formula, equipment, and precursors necessary to manufacture PCP. This evidence shows that Tobias was predisposed to manufacture a controlled substance, although no one drug in particular.

If law enforcement agents are precluded from discussing the particulars of how a criminal enterprise is to be conducted, the undercover work that is essential to the investigation and prosecution of drug offenses becomes impossible. Suggestions regarding the particulars of manufacturing one drug or another did not vitiate the predisposition which is best shown by Tobias's continuance of the conversation.

## II.

Tobias next argues that if the government had not provided him with the formula, necessary precursors, and continuing advice during the manufacturing process, he would have been unable to manufacture PCP. Thus, he argues that the government's involvement in this scheme was so outrageous that due process principles bar his convictions. This presents a tougher question.

Tobias's argument has its foundation in *United States v. Russell,* 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973). In *Russell,* the Supreme Court held that the defense of entrapment was foreclosed to one who was predisposed to commit a crime, regardless of the type and degree of government activity involved. The Court, however, expressed the possibility that due process principles might prohibit an excessive degree of government involvement, stating: "[W]e may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction...." 411 U.S. at 431–32, 93 S.Ct. at 1642–1643. (citation omitted). While the Court pointed out that in certain situations the conduct of the government may bar prosecution, it em-

phasized that the defendant must show that the challenged government conduct violates " 'that fundamental fairness, shocking to the universal sense of justice,' mandated by the due process clause of the fifth amendment." 411 U.S. at 432, 93 S.Ct. at 1643 (quoting *Kinsella v. United States ex rel. Singleton,* 361 U.S. 234, 246, 80 S.Ct. 297, 303, 4 L.Ed.2d 268 (1960)).

In *Hampton v. United States,* 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976) (plurality opinion), the only case in which the Court has considered the *Russell* defense, a majority of the Justices agreed that in certain circumstances, the government's conduct may be so outrageous as to violate due process. Justice Powell pointed out, however, that "[p]olice overinvolvement in crime would have to reach a demonstrable level of outrageousness before it could bar convictions." 425 U.S. at 495 n. 7, 96 S.Ct. at 1653.

In the recent case of *United States v. Gray,* 626 F.2d 494 (5th Cir.), *cert. denied,* 449 U.S. 1038, 101 S.Ct. 616, 66 L.Ed.2d 500 (1980), this court was presented with the question whether the government's conduct was so outrageous as to require reversal of convictions for violation of due process. In *Gray,* two government agents suggested a smuggling scheme to defendants and provided them with repair services, an airstrip, and a crew. The court, although acknowledging that the government agents suggested the scheme and aided in arranging the air transportation, held that "the providing of essential services is not misconduct." 626 F.2d at 498.

In *United States v. Leja,* 563 F.2d 244 (6th Cir. 1977), *cert. denied,* 434 U.S. 1074, 98 S.Ct. 1263, 55 L.Ed.2d 780 (1978), the Sixth Circuit addressed a similar issue. In *Leja,* the defendant approached a government informant and suggested that the two produce PCP in a laboratory. They entered into an agreement which provided that the government informant would obtain the necessary chemicals and the other two defendants would supply glassware, money, and technical expertise. Not only did the government informant provide the chemi-

cals necessary to produce PCP, but another government informant provided technical instructions concerning the manufacturing process when one of the defendants encountered difficulties. The Sixth Circuit, relying on the fact that the government agent neither solicited the defendants nor provided them with chemicals and information which they could not have obtained elsewhere, held that the due process clause did not require reversal of their convictions.

In *United States v. Twigg,* 588 F.2d 373 (3rd Cir. 1978), however, the Third Circuit found the government's conduct so outrageous as to violate due process because the government agent suggested the establishment of a drug laboratory, provided the place, equipment, supplies and know-how, and then ran the entire operation with only meager assistance from the defendants.

■ From these cases emerges the basic proposition that government infiltration of criminal activity is a "recognized and permissible means of investigation." *Russell,* 411 U.S. at 432, 93 S.Ct. at 1643. "This proposition remains true even though the ... government agent ... supplies something of value to the criminal." *United States v. Brown,* 635 F.2d 1207 (6th Cir. 1980). This is necessary so that the agent "will ... be taken into the confidence of the illegal entrepreneurs." *Russell,* 411 U.S. at 432, 93 S.Ct. at 1643. On the other end of the spectrum, however, the government may not instigate the criminal activity, provide the place, equipment, supplies and know-how, and run the entire operation with only meager assistance from the defendants without violating fundamental fairness. *Twigg.*

■ Although the DEA provided the formula and some of the chemicals for the manufacture of PCP, the chemicals were not difficult to obtain and, in fact, some were ordered from a chemical supply house in Mobile. DEA provided no financial aid for Tobias's operation. In sum, "[t]he law enforcement conduct here stops far short of violating that 'fundamental fairness, shocking to the universal sense of justice,' mandated by the due process clause of the fifth

amendment." *Russell*, 411 U.S. at 431–432, 93 S.Ct. at 1642–1643.

The cases demonstrate that outrageous involvement turns upon the totality of the circumstances with no single factor controlling. Although a totality of the circumstances standard must be applied, it is beneficial to review the parts that make up the whole. The DEA, in this case, did not initiate contact with Tobias. May the government be held to have involved itself in outrageous conduct by placing the ad in *High Times*? Similarly, may the government be condemned for shipping the necessary chemicals, even at cut-rate prices? Or, was it outrageous for DEA to deliver the chemicals to Tobias's home? We think not. The crucial factor in this total fact picture is the step-by-step advice given by the DEA agents. This advice was given to Tobias or his wife on more than thirteen occasions. On each occasion, however, Tobias or his wife contacted the DEA. This would be a more difficult case if the DEA had pursued Tobias by repeated phone calls and encouragement. But here, the drug transaction would have stopped at any time that Tobias made no further calls.[3] Instead of being a *predisposed inactive participant* in this scheme to manufacture and distribute PCP (a cheap mind bending drug) primarily sold to youngsters, Tobias was a *predisposed active participant*, motivated solely by a desire to make money. It is this predisposition plus active and insistent participation that sets this case apart from *Hampton v. United States*, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976), and cases finding a due process violation. We are mindful of the Supreme Court's admonition that due process can only be invoked in the rarest and most outrageous circumstances. Yet, this case does set the outer limits to which the government may go in the quest to ferret out and prosecute crimes in this circuit.

---

**3.** If the DEA agents had followed any course other than that followed here they probably would have destroyed the cover they had successfully established. Was Tobias an organized crime figure, a purchaser for organized crime, or a small-time drug pusher? The only way to answer such questions was to follow the investigative leads.

## III.

Tobias argues that the district court's failure to examine him orally on the record in order to determine whether his waiver of trial by jury was made intelligently and understandingly constitutes reversible error. Rule 23(a) Fed.R.Crim.P. required that this case be tried by jury "unless the defendant waive[d] a jury trial in writing with the approval of the court and the consent of the government." A written waiver is in the record. Tobias does not claim that he was prejudiced in any way by the failure to examine him in open court; he simply asserts that this omission is a per se basis for reversal. We disagree.

A written waiver is sufficient to waive trial by jury under Rule 23(a) Fed.R.Crim.P. The district court fully complied with Rule 23(a). Absent a claim of prejudice, we presume that Tobias understandingly and intelligently waived his right to jury trial. *Cf. United States v. Lockwood*, 604 F.2d 7 (5th Cir. 1979) (new trial ordered where record did not contain a written waiver signed by the defendant and his attorney, consented to by the United States Attorney and approved by the court).

## IV.

At oral argument, counsel for Tobias urged us to "review the harshness of the sentence imposed in this case. We were informed that Tobias is a twenty-one or twenty-two year old married man, employed as a house painter who, with the exception of an arrest for a minor exchange of fisticuffs, had no prior criminal record of any kind. He has been sentenced to a fifteen year penitentiary term to be followed by a ten year special parole term. At oral argument, the government stated that Tobias's severe sentence was based in part upon his possession of enough chemicals to manufacture 300,000 units of PCP and his actual manufacturing of enough liquid PCP to produce 5,000 units of the drug. On the

severity of the sentence, our inquiry is short; we may not review sentences. *United States v. Small*, 636 F.2d 126 (5th Cir. 1981); *United States v. Clements*, 634 F.2d 183 (5th Cir. 1981); *Herron v. United States*, 551 F.2d 62 (5th Cir. 1977). There are, however, two sentencing problems in this record which require our review. One is the use of a false assumption in the sentencing process, and the other is the failure of the trial court to consider mandatory alternative sentencing techniques.

▇▇▇▇ At the outset we are faced with the problem that Tobias has never alleged that his sentence may have been based upon erroneous information or assumptions. Ordinarily, the failure to make and pursue this allegation is fatal to relief. Constitutional issues not raised in the trial court, however, can be considered by this court on its own motion under the plain error doctrine. Fed. R.Crim.P. 52(b); *Alexander v. United States*, 390 F.2d 101, 103 n.3 (5th Cir. 1968). Further, "errors of constitutional magnitude will be noticed more freely under the plain error rule than less serious errors . . . ." *United States v. Brown*, 555 F.2d 407, 420 (5th Cir. 1977). Reliance upon incorrect assumptions from the evidence when passing sentence violates due process and clearly constitutes plain error. The record discloses that the sentence in this case is based primarily upon the large quantity of chemicals. The trial court's statements at sentencing bear out this consideration.[4] It is critical to note that DEA agents supplied those quantities of chemicals to Tobias at their own discretion and not at his request. Further, the production of a sufficient quantity of liquid PCP to form 5,000

units was fortuitous as far as Tobias is concerned since the DEA supplied the formula and nothing in the record indicates that Tobias had any awareness of the number of units that could be produced by following the formula.

▇▇▇▇ A trial court has broad discretion in passing sentence. Nevertheless, "a defendant retains the right not to be sentenced on the basis of invalid premises." *United States v. Espinoza*, 481 F.2d 553, 555 (5th Cir. 1973). Sentences based upon erroneous and material information or assumptions violate due process. *United States v. Tucker*, 404 U.S. 443, 92 S.Ct. 589, 30 L.Ed.2d 592 (1971) (sentence based upon prior, unconstitutional convictions); *Townsend v. Burke*, 334 U.S. 736, 740, 68 S.Ct. 1252, 1255, 92 L.Ed. 1690 (1940) (sentence based upon "assumptions concerning [the defendant's] criminal record which were materially untrue"). The proper remedy where a trial court relies upon erroneous information or assumptions is to remand to the district court for a new sentencing hearing. *See United States v. Battaglia, Jr.*, 478 F.2d 854 (5th Cir. 1972). The assumptions that Tobias knowingly and intentionally obtained enough chemicals to manufacture 300,000 units of PCP and to generate 5,000 units of the drug are not supported in the record.

▇▇▇▇ There is another reason why Tobias must be resentenced. The judgment in this case does not designate the statutory provision under which Tobias was sentenced. It is also impossible from the record to determine Tobias's exact age. It is possible that Tobias was, at the time of conviction, of such age as·to be covered by the provisions

---

4. The trial judge made a number of statements at the sentence hearing indicating that he was influenced by the defendant's capacity to manufacture 300,000 units of PCP.

    THE COURT: Mr. Tobias, do you realize how much damage 300,000 units of PCP could have reeked on this community?

    DEFENDANT: Yes, Your Honor.

    THE COURT: Do you realize how much hard—I don't know what the term ought to be—how much pain and suffering that parents would have gone through with that being made available to their children?

        \*     \*     \*     \*     \*     \*

    THE COURT: It is a very, very serious matter that this mind-bending drug is made available so inexpensively to so many people.

    It is of great concern to this Court, not that I have any lack of sympathy for Mr. Tobias, he is young, but what was attempted is one of the disasters of the age and it just cannot be condoned. It cannot be permitted.

of the Youth Corrections Act, 18 U.S.C. § 5005 *et. seq.*, and § 5010(b–d).[5] If Tobias was within the coverage of the act at the time of conviction, then under *Dorszynski v. United States*, 418 U.S. 424, 94 S.Ct. 3042, 41 L.Ed.2d 855 (1974), the trial court was obligated to consider the Youth Corrections Act and to make a finding that sentencing under that act would be of "no benefit." *United States v. Hall*, 525 F.2d 970 (5th Cir. 1976); *United States v. Gradowski*, 502 F.2d 563 (5th Cir. 1974).

It is an abuse of discretion for the trial court to fail to follow the mandate of *Dorszynski*.[6] In light of these sentencing discrepancies, we remand the case to the trial court for sentencing by a new judge untainted by improper assumptions.

## CONCLUSION

We hold that (1) the district court properly refused Tobias's motion for judgment of acquittal based on his defense of entrapment; (2) the government's involvement in this illegal scheme did not violate due process; (3) the district court did not err in failing to orally examine Tobias on the record to determine whether his written waiver of trial by jury was made intelligently and knowingly; and (4) the conviction is affirmed, and the case remanded for resentencing.

**AFFIRMED AND REMANDED FOR RESENTENCING.**

FRANK M. JOHNSON, Jr., Circuit Judge, dissenting:

Because I conclude that the Drug Enforcement Agency's (DEA) "overinvolvement" in the commission of the crime for which defendant was convicted precludes prosecution under either the due process clause or the Court's supervisory powers, and because the majority improperly disqualified the district court judge from resentencing the defendant, I am unable to agree with the majority's opinion and therefore respectfully dissent.

Tobias is a 21- or 22-year-old married man employed as a house painter. With the exception of a minor exchange of fisticuffs, he has no prior record of any kind and had never been convicted of a drug related offense. In early 1980 Tobias responded to an advertisement in *High Times*, an over-the-counter drug culture periodical, and sought information concerning the purchase of chemicals necessary to make cocaine. Defendant requested a catalogue from the chemical supply company and eventually ordered what he thought were chemicals needed to manufacture cocaine. Unbeknownst to Tobias, the chemical supply company, located in a mid-western state, was owned and operated by the DEA. On April 25, 1980, Tobias called the company to cancel his order and spoke to DEA Agent Schabilion. He advised Schabilion that he intended to use the chemicals to manufacture cocaine but had concluded that he lacked the requisite knowledge and equipment necessary to make the drug. Indeed, the record reflects that Tobias was ineptly suited to make cocaine. His education extended only as far as high school, whereas manufacturing cocaine requires a "sophisticated chemical background." Further, it appears that Tobias never had even a basic understanding of what was needed to manufacture the drug, both in terms of the necessary chemicals and in terms of the necessary knowledge of chemistry.[1] During

---

**5.** 18 U.S.C. § 5010(b) provides:

   If the court shall find that a convicted person is a youth offender, and the offense is punishable by imprisonment under applicable provisions of law other than this subsection, the court may, in lieu of the penalty of imprisonment otherwise provided by law, sentence the youth offender to the custody of the Attorney General for treatment and supervision pursuant to this chapter until discharged by the Commission as provided in section 5017(c) of this chapter; . . . .

**6.** It is also unclear from the record whether the trial court actually considered Tobias's request that he be sentenced under the narcotic treatment provisions of 18 U.S.C. § 4205(b)(2).

**1.** Tobias originally ordered four chemicals from the supply company and later added two more. According to counsel for the Government, DEA officials did not ship the chemicals because

the course of the conversation, Schabilion emphasized the difficulty and expense involved in manufacturing cocaine and suggested a number of "cheaper" and "easier" alternatives. "I advised him [Tobias] that almost anything would be cheaper and easier to manufacture than cocaine, and suggested that any of the amphetamines, speed or PCP would be easier." Until that statement, nothing in the record reveals any intent or disposition on the part of Tobias to attempt the manufacture of any drug other than cocaine. Tobias admitted to Schabilion that there might be a market for PCP in the Mobile area but expressed reservations about making the drug, stating that he had no background in chemistry. At that point in the conversation Agent Schabilion explained that manufacturing PCP was as easy as "baking a cake." The agent, according to defendant, also told him that selling the drug would be profitable. Without any discussion as to particular chemicals or quantities, Schabilion promised to supply Tobias with everything necessary to make PCP, including the formula, at a total cost of $500. Tobias then agreed to purchase the chemicals and delivery was made in Mobile, Alabama, by a DEA agent acting as an employee of a fictitious delivery company. The defendant received two separate deliveries on the same day and paid $101 for the chemicals, the total amount requested by the DEA. The DEA supplied Tobias with all of the necessary ingredients of PCP except diethyl ether, which Tobias obtained at a local chemical supply store.

Utilizing the chemicals provided by the DEA and the formula provided by the DEA, Tobias attempted to manufacture a drug suggested by the DEA. However, the agency's encouragement, pervasive influence, and active participation did not end there. Still uncertain about how to actually make the drug, from April 29 through May 9 Tobias telephoned the supply company 13 times and his wife called on three other

occasions to obtain information and additional advice concerning the procedure at each stage of the manufacturing process. It is undisputed that Tobias did not know how to make PCP and that during those phone calls the DEA agents instructed him as to each step in the process. Agents for the Government, therefore, guided the defendant in every stage of the process, from inception to termination. Tobias was ultimately arrested and, despite his status as a first-time drug offender, his youthful age and his family situation, was cumulatively sentenced to fifteen years' incarceration and ten years' special parole.

Government involvement and assistance in the criminal activities of others are sometimes necessary to enforce the laws. The degree of Government involvement is not, however, boundless. In *United States v. Russell*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973), and *Hampton v. United States*, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976), the Supreme Court observed that, when involvement by federal agents in the commission of a crime is so outrageous as to shock the conscience, either due process or the Court's supervisory powers will preclude prosecution. These decisions make clear that as a general rule infiltration and "limited involvement" by Government agents in a drug related enterprise do not run afoul of the due process clause and in fact constitute a legitimate method of apprehending offenders. The Supreme Court also admonished that due process is not meant to provide federal courts with a "chancellor's foot" veto over investigatory techniques that lack judicial approbation. The two cases read in tandem demonstrate that only extreme and outrageous Government involvement in the commission of a crime will justify reversing for that reason a conviction under the due process clause.

they were unable to tell from the order what Tobias was trying to manufacture. Apparently Tobias' list of chemicals was either incomplete or inaccurate, indicating that he did not know the proper ingredients. Further, it was Agent

Schabilion during the April 25 phone call who had to explain to Tobias about the chemicals, precursors, expense and technical knowledge necessary to make cocaine.

Although providing a rudimentary framework for analysis, neither *Russell* nor *Hampton* delineated with clarity the point at which Government involvement becomes shocking and outrageous. However, some lower court decisions have found the requisite level of outrageous involvement and provide useful guidance. In *Greene v. United States*, 454 F.2d 783 (9th Cir. 1971), a case cited by the Supreme Court in *Hampton*, the defendants contacted a Government agent concerning the possibility of manufacturing and selling bootleg whiskey. The agent represented himself to be a member of the "syndicate" and agreed to both provide financial assistance and buy all of the whiskey produced. Extensive communications transpired between the parties, with the agent providing the defendants with substantial assistance. He helped search for an appropriate site for the still, agreed to provide equipment and an operator for the still, and made available two thousand pounds of sugar at wholesale prices. The agent also tried to prompt the defendants by intimating that he was receiving pressure for the whiskey from his syndicate boss. On appeal, the court noted that the defendants evinced a predisposition to commit the crime and could not, therefore, invoke the "usual entrapment defense." However, because of the extensive and aggressive overinvolvement by the agent in the crime, the conviction was reversed. "[W]hen the Government permits itself to become enmeshed in criminal activity, from beginning to end, to the extent which appears here, the same underlying objections which render entrapment repugnant to American criminal justice are operative." *Id.* at 787.

Similarly in *United States v. Twigg*, 588 F.2d 373 (3d Cir. 1978), DEA agents initiated contact with the defendants and suggested that they construct a laboratory for manufacturing amphetamines. The DEA agents supplied the defendants with the necessary chemicals at a discount price, supplied a portion of glassware to be used, and provided a barn as the situs for the laboratory. The agents facilitated defendants' ability to purchase chemicals from other supply companies and made available the necessary funds to make the purchases. A DEA agent also supervised the entire manufacturing process, with the defendants providing only minor production assistance. The Third Circuit rejected the defense of entrapment, finding evidence of predisposition. However, the court reversed the conviction and held that "the nature and extent of police involvement in this crime was so overreaching as to bar prosecution of the defendants as a matter of law." *Id.* at 377. *Accord, United States v. Jannotti*, 501 F.Supp. 1182 (E.D.Pa.1980) (dismissing indictment on ground that Government's overreaching violated due process); *see also United States v. Archer*, 486 F.2d 670, 676 (2d Cir. 1973) ("[T]here is certainly a limit to allowing governmental involvement in crime.").

The cases demonstrate that outrageous involvement turns upon the totality of the circumstances with no single factor controlling. Under such a standard, it is my judgment that the DEA's overinvolvement in this case requires reversal of the conviction. The DEA agents placed the advertisement for the chemicals in *High Times* magazine. The majority justifies this conduct by observing that it was for the purpose of pursuing "undercover investigations of clandestine laboratory operators ...". While that may have been the purpose of the operation of the chemical supply house, in this case the advertisement constituted the initial contact with a young man that had up until then indicated no predisposition to manufacture drugs. When it became apparent that Tobias was completely stymied in his predisposition to manufacture cocaine, the agents advanced the idea of manufacturing an "easier" and "cheaper" drug. Tobias was provided with almost all of the necessary chemicals at apparently cut-rate prices, was provided with the formula for manufacturing the PCP and was persuaded to make PCP in part by the statement that the process was no more difficult than "baking a cake." The DEA agents personally delivered the chemicals to his home and gave technical advice concerning the

amount and sequence of combining each separate ingredient at every step of the manufacturing process. Admittedly, the agents did not other than the advertisement initiate contact with Tobias, but that fact is not dispositive. *See Greene v. United States, supra,* 454 F.2d 783.[2]

This case does not merely involve law enforcement officers supplying Tobias with an "item of value" necessary to make the prohibited drug. Such a practice is universally recognized as an acceptable investigative technique. Here, Tobias amounted to little more than a conduit. Had the Government agents at any point ceased pro-

viding Tobias with assistance and encouragement, the record indicates that he would have been incapable of manufacturing the illicit drug. Thus Government agents vicariously manufactured PCP through Tobias in order to gather evidence to justify his prosecution. The instant case therefore involves that rare degree of Government involvement in the commission of a crime that *Hampton* and *Russell* intended to prevent.[3] I do not, of course, propose that federal courts be accorded a "chancellor's foot" veto over law enforcement techniques that are disapproved. *United States v. Russell, supra,* 411 U.S. at 431, 93 S.Ct. at

---

2. The majority indicates that the DEA's failure to provide Tobias with "financial aid" distinguishes the case from prior decisions dealing with Government overinvolvement. The record indicates, however, that the Government did provide Tobias with "financial assistance." Tobias was originally informed that the chemicals would cost $500. Nonetheless, when the DEA agent delivered the chemicals, he charged Tobias only $101. Moreover, the DEA agent made a second delivery on the same day and did not charge Tobias *anything* for the additional chemicals. Thus, although the record is not totally clear, the Government appears to have provided "financial assistance" to Tobias in the form of reduced prices for the chemicals used to manufacture the PCP.

3. A significant number of recent decisions have dealt with unsuccessful attempts to show that Government involvement in a drug related offense violated due process. None, however, involved the degree of pervasive involvement found in the instant case. *E. g., United States v. Tavelman,* 650 F.2d 1133 (9th Cir. 1981) (DEA agent induced defendants to purchase cocaine); *United States v. Gentry,* 642 F.2d 385 (10th Cir. 1981) (DEA agents operated chemical supply company and supplied technical information and chemicals to defendant); *United States v. Gray,* 626 F.2d 494 (5th Cir.), *cert. denied,* 449 U.S. 1038, 101 S.Ct. 616, 66 L.Ed.2d 500 (1980) (DEA agents aided and assisted marijuana smuggling ring); *United States v. Wylie,* 625 F.2d 1371 (9th Cir.), *cert. denied,* 449 U.S. 1080, 101 S.Ct. 863, 66 L.Ed.2d 804 (1980) (DEA agents purchased drugs and provided defendant with chemicals); *United States v. Nunez-Rios,* 622 F.2d 1093 (2d Cir. 1980) (DEA agent purchased drugs from defendant); *United States v. Till,* 609 F.2d 228 (5th Cir.), *cert. denied,* 445 U.S. 955, 100 S.Ct. 1607, 63 L.Ed.2d 791 (1980) (DEA agents purchased marijuana from defendants); *United States v. Corcione,* 592 F.2d 111 (2d Cir.), *cert. denied,* 440 U.S. 975, 99 S.Ct. 1545, 59 L.Ed.2d 794

(1979) (DEA informant sold heroin to defendants); *United States v. Prairie,* 572 F.2d 1316 (9th Cir. 1978) (State drug enforcement officer purchased cocaine from defendant); *United States v. Leja,* 568 F.2d 493 (6th Cir. 1977) (Government informant infiltrated defendants' drug manufacturing enterprise); *United States v. Thomas,* 567 F.2d 638 (5th Cir.), *cert. denied,* 439 U.S. 822, 99 S.Ct. 90, 58 L.Ed.2d 114 (1978) (DEA agents contracted with defendants for the importation of cocaine); *United States v. Leja,* 563 F.2d 244 (6th Cir. 1977), *cert. denied,* 434 U.S. 1074, 98 S.Ct. 1263, 55 L.Ed.2d 780 (1978) (DEA informant infiltrated drug manufacturing enterprise and DEA agent provided some technical information for manufacturing PCP); *United States v. Smith,* 538 F.2d 1359 (9th Cir. 1976) (DEA agents supplied defendant with chemicals and DEA informant infiltrated drug manufacturing enterprise); *United States v. Weber,* 518 F.2d 987 (8th Cir. 1975), *cert. denied,* 427 U.S. 907, 96 S.Ct. 3193, 49 L.Ed.2d 1200 (1976) (DEA informant infiltrated defendants' drug manufacturing enterprise); *United States v. Spivey,* 508 F.2d 146 (10th Cir.), *cert. denied,* 421 U.S. 949, 95 S.Ct. 1682, 44 L.Ed.2d 104 (1975) (Government informant infiltrated drug dealing enterprise and supplied defendant with marijuana); *United States v. Arias-Diaz,* 497 F.2d 165 (5th Cir. 1974), *cert. denied,* 420 U.S. 1002, 95 S.Ct. 1445, 43 L.Ed.2d 761 (1975) (Government informant infiltrated drug ring and flew plane carrying marijuana for defendants); *United States v. Register,* 496 F.2d 1072 (5th Cir. 1974), *cert. denied,* 419 U.S. 1120, 95 S.Ct. 802, 42 L.Ed.2d 819 (1975) (Agents of the Bureau of Narcotics and Dangerous Drugs infiltrated defendant's drug smuggling ring); *United States v. Katz,* 509 F.Supp. 998 (E.D.N.Y. 1981) (DEA agents aided defendants' efforts to manufacture drugs); *United States v. Campa,* 474 F.Supp. 507 (S.D.Fla.1979) (DEA agents infiltrated drug dealing enterprise and supplied defendants with cocaine); *McCarroll v. Alabama,* 422 F.Supp. 137 (S.D.Ala.1976).

1642. I do suggest, however, that the majority goes too far by holding, in effect, that no matter how egregious and shocking the degree of Government involvement in the commission of a crime, neither the due process clause nor the court's supervisory powers will ever be invoked to preclude prosecution.[4]

Courts are rightfully loathe to overturn convictions on the basis of Governmental overinvolvement in the commission of a crime, recognizing that law enforcement officials need wide latitude in devising appropriate methods and tactics for apprehending violators. However, judicial tolerance of Governmental involvement in criminal activity should not constitute a *carte blanche*; there is still a point beyond which law enforcement officials cannot go. As Justice Brandeis observed, "[t]o declare that in the administration of criminal law the end justifies the means—to declare that the Government may commit crimes in order to secure the conviction of a private criminal—would bring terrible retribution." *Olmstead v. United States*, 277 U.S. 438, 485, 48 S.Ct. 564, 575, 72 L.Ed. 944 (1927) (Brandeis, J., dissenting). The direct, continual involvement by Government agents in the creation, maintenance and commission of a crime, to the extent reflected in this case, goes beyond the perimeter of permissible conduct and should not be countenanced by this Court.

I am also unable to agree with the majority's decision to remand the case to a "new judge untainted by improper assumptions" for resentencing. The facts of this case do not justify the majority's somewhat cavalier decision to disqualify the original district court judge from resentencing Tobias.

Generally, judges will be disqualified on one of two grounds: prejudice, *see United States v. Long*, 656 F.2d 1162 (5th Cir. 1981), or bias, *see United States v. Holland*, 655 F.2d 44 (5th Cir. 1981). Bias is present where the judge has a personal stake in the outcome or displays favoritism or antagonism towards a party. The imposition of a severe sentence will not result in the disqualification of a judge for bias so long as the sentence falls within the statutory limits. *United States v. Conforte*, 457 F.Supp. 641, 653 (D.Nev.1978), *affirmed*, 624 F.2d 869 (9th Cir. 1980). Prejudice occurs where the judge has prejudged the merits of the case.

The facts of the instant case reveal that, at worst, the trial judge made a mistake. He improperly relied upon certain assumptions[5] at sentencing and failed to make the requisite determination concerning the defendant's eligibility for sentencing under the Youth Corrections Act. Nowhere does the record reveal even one scintilla of evidence indicating bias or prejudice on the part of the trial judge, and the majority fails to provide any other reason why disqualification is necessary. Under these circumstances, the appropriate disposition of the case would have been to direct the sentencing judge on remand to correct the errors that occurred in sentencing Tobias.

For the above reasons, I respectfully dissent.

---

**4.** The majority opinion in effect limits the overinvolvement defense to the precise circumstances of *United States v. Twigg, supra*, 588 F.2d 373. Such an interpretation is far too narrow and if followed would eliminate overinvolvement as a viable defense.

**5.** The majority opinion fairly recites the improper assumption relied upon by the trial judge, *i. e.*, that Tobias' crime was more egregious and a more severe sentence was required because of the *quantity* of the controlled substance possessed by Tobias, when the facts

reflected that Tobias had nothing to do or say as to the *quantity*. He simply accepted the chemicals shipped to him by the DEA. The trial judge obviously overlooked the fact that it was the DEA agents who made the determination that chemicals would be shipped to Tobias in sufficient quantity to produce 300,000 units of PCP. Furthermore, it was the DEA agents, through the sixteen telephone conversations, who determined the actual number of units manufactured into liquid form.