**UNITED STATES of America,**
**Plaintiff–Appellant,**

v.

**John M. EDENFIELD, James C. Edenfield, Defendants–Appellees.**

**No. 92–8877.**

United States Court of Appeals,
Eleventh Circuit.

July 14, 1993.

Mary Jane Stewart, Asst. U.S. Atty., Atlanta, GA, for plaintiff-appellant.

John Richard Martin, Martin Brothers, Atlanta, GA, for John M. Edenfield and James C. Edenfield.

Before EDMONDSON and BLACK, Circuit Judges, and MELTON *, Senior District Judge.

EDMONDSON, Circuit Judge:

In this drug distribution case, the district court dismissed the federal indictment for "outrageous misconduct" by state officers who investigated the charged offenses. We reverse.

## I. *Background*

The important facts are undisputed. John and James Edenfield ("defendants") admit that they used cocaine, shared cocaine with friends, and sold cocaine to friends at cost.[1]

The evidence showed that John Edenfield, Sr., defendants' father, was a prominent Thomaston, Georgia businessman. Defendants' father was on bad terms with the Upson County Sheriff, Merrill Greathouse. The elder Edenfield had exchanged hard words with the Sheriff over Sheriff Greathouse's investigation of an Edenfield employee and had actively supported the Sheriff's opponent in local elections.

---

* Honorable Howell W. Melton, Senior U.S. District Judge for the Middle District of Florida, sitting by designation.

1. Br. of Appellees at 3.

Tony Watson was a friend of the defendants. Watson's car business was failing and he needed money. In 1989, Watson initiated a meeting with Sheriff Greathouse and a Georgia Bureau of Investigation (GBI) agent, Charles McMichen. Watson proposed that, in exchange for $10,000, he would act as a confidential informant against the Edenfields. Sheriff Greathouse and Agent McMichen agreed to pay Watson an informant fee, but only for "results" or "COD."

In September and October 1989, state officers supervised four separate controlled buys of one-eighth ounce amounts of cocaine by Watson from defendants. The police obtained physical evidence, photographs, and tape recordings of those transactions but made no arrest. The police paid Watson about $3600 for those four transactions.

Sheriff Greathouse met with Watson in late October, 1989. The Sheriff told Watson that the officers' goal was for an Edenfield "to be busted with over an ounce."[2] The Sheriff offered that, if Watson could get one of the Edenfield boys in a car with more than an ounce of cocaine, the Sheriff and the GBI would pay Watson $10,000—$4,000 in advance and $6,000 afterward. Watson agreed; and the sheriff paid him the $4,000 advance, part of which the sheriff had apparently personally borrowed from a bank.

On November 10, 1989, James Edenfield called Watson asking for Watson to arrange for them to buy "14" from an Atlanta dealer, Frady. Watson thought Edenfield meant $1,400 worth, or about an ounce of cocaine. Watson reported this information to Sheriff Greathouse and then ordered the ounce from Frady. Later conversation made clear that Edenfield had meant 14 grams (about a half-ounce), and Watson called Greathouse with that new information. Watson, Sheriff Greathouse, and Special Agent McMichen met to discuss the transaction. Sheriff Greathouse gave Watson $800 to buy an additional half-ounce, ostensibly for Watson; and the GBI agent gave him $500 to buy an additional one-eighth of an ounce. The GBI agent testified that the plan was that the

total purchase (Edenfield's half-ounce, plus Watson's half- and eighth-ounce purchases) would be more than one ounce, enough for a "trafficking case."

Watson and James Edenfield went to Atlanta to meet Frady at a drive-in restaurant. En route, Watson told Edenfield twice that Watson intended to buy a second half-ounce for himself and showed defendant his money. Watson met with Frady and bought parcels of cocaine totalling one and one-eighth ounces, which Watson put together in one bag and gave to Edenfield in the car. As planned, Watson asked Edenfield to drop Watson off on the way home to pick up a car. Edenfield dropped Watson off in Griffin, Georgia. Shortly afterward, James Edenfield was arrested enroute from Griffin to Thomaston and later charged with trafficking cocaine under state law.

Later, a federal grand jury indicted the Edenfields for four federal drug offenses. Count one of the indictment charged that defendants had conspired to possess with intent to distribute cocaine in violation of 21 U.S.C. § 846. Three other counts charged that defendants had possessed cocaine with intent to distribute in violation of 21 U.S.C. § 841 and 18 U.S.C. § 2 on three occasions, including the November 10 transaction.

Defendants moved the district court to dismiss the federal indictment, claiming their due process rights were violated by outrageous government misconduct. After an evidentiary hearing about the investigation of the defendants, the district court granted the motion, saying:

> While no one factor is controlling in this matter, the court finds that given the political and personal interest of law enforcement officials involved in this case, the preselection of the investigatory target, the government's entering into a contingent fee agreement with an informant to get an Edenfield, and the overinvolvement of the informant as an agent of the government in the planning and execution of the crime charged, law enforcement conduct in

---

**2.** Under Georgia law, a conviction for distributing more than one ounce of cocaine mandates a minimum ten-year term of imprisonment and a $100,000 fine with no possibility of probation. *See* O.C.G.A. § 16–13–31(a).

this case is so egregious as to offend principles of due process.[3]

The government brought this appeal.

## II. *Discussion*

█ Our cases have recognized that "in the rarest and most outrageous circumstances" government conduct might violate "'that fundamental fairness, shocking to the universal sense of justice mandated by the due process clause of the fifth amendment.'" *United States v. Tobias,* 662 F.2d 381, 386–87 (5th Cir. Unit B 1981), *quoting United States v. Russell,* 411 U.S. 423, 432, 93 S.Ct. 1637, 1643, 36 L.Ed.2d 366 (1973). Whether facts show misconduct so outrageous that it bars prosecution is a question of law which we review *de novo,* looking at the "totality of the circumstances." *Tobias,* 662 F.2d at 387.

█ We think no government acts violated the Edenfields' due process rights. The evidence showed that for the offenses charged the defendants were "predisposed active participants." *See id.* The evidence shows defendants used *and distributed* cocaine before the investigation in this case. Equipped with their own, independently acquired knowledge, personal contacts and hardware, defendants started each of the drug transactions mentioned in the federal indictment. The government did not "instigate the criminal activity, provide the place, equipment, supplies, and know-how, and run the entire operation with only meager assistance from the defendants." *Cf. id.* at 386, *citing United States v. Twigg,* 588 F.2d 373 (3rd Cir.1978).

█ For the district court to view the government's fee agreement with Watson as part of a due process violation was wrong. Although "in rare cases, use of a contingently motivated informer might, conceivably, be so outrageous as to violate due process," we have rejected the idea "that absent justification or explanation, payment of an informer contingent upon obtaining the conviction of a specific person *in itself* violates due process." *United States v. Rey,* 811 F.2d 1453, 1456 (11th Cir.1987). We see nothing outrageous about the government's refusal to pay Watson part of his fee until he produced useful

evidence. *Cf. United States v. Shearer,* 794 F.2d 1545, 1549 (11th Cir.1986) (fee paid to informer before defendant's trial was not contingent on conviction and so violated no due process rights). No fee was contingent upon obtaining a conviction.

█ In a similar way, it was error for the district court to factor "preselection of the investigatory target" into its ultimate conclusion. This case is no preselection case: the investigation began only after Watson approached the government offering to act as an informant against persons, including Edenfields, whom Watson knew to be involved with drugs. Where a potential informer approaches the government with names and the government merely "select[s] who the informer would concentrate upon before making the financial arrangements ... the agents' decision is better described as an approval than as a selection." *United States v. Richardson,* 764 F.2d 1514, 1520 (11th Cir.1985).

█ And it is irrelevant, for due process purposes, that there was political enmity between the Edenfields and Sheriff Greathouse or that the Edenfields were prominent in their community. For law enforcement officers to choose to investigate prominent offenders is nothing unusual or evil. It is a showing of outrageous *misconduct,* not evidence about an officer's possible motives, that bars prosecution under the due process clause.

█ We also see no outrageous misconduct in Watson's role in planning and executing the crimes charged. Although the evidence showed that Watson's purchases in the November 10 transaction were designed to support a mandatory minimum trafficking sentence under Georgia law, we have expressly rejected the theory of "sentence entrapment." *See, e.g., United States v. Williams,* 954 F.2d 668, 672–73 (11th Cir. 1992) (no defense that "government manipulated the transaction in order to get the mandatory minimum sentence"). This case is not one where the government instigated commission of a distribution offense by mere

---

3. R. Vol. 1–62 at 20.

users; these defendants were long-time and admitted distributors. And we point out that no minimum quantity of drugs is an element of the charged federal offense of possessing with intent to distribute cocaine. Therefore, the presence of an ounce or more of cocaine in Edenfield's automobile is not a critical matter. Simply put, nothing about the government's conduct in this case is shocking to the "*universal* sense of justice" of the due process clause. *Russell*, 411 U.S. at 432, 93 S.Ct. at 1643 (emphasis added).

Considering the "totality of the circumstances" as well as the "parts that make up the whole," *Tobias*, 662 F.2d at 387, we conclude that the government's conduct in investigating the charged offenses violates no due process rights of the appellees. It was error to dismiss the indictment.[4]

### III. *Conclusion*

The order dismissing the indictment is VACATED and the case is REMANDED for further proceedings consistent with this opinion.

---

4. The misconduct in this case was conduct of state officers acting apart from the federal government. Yet it is a federal prosecution for the violation of federal law that would be barred. We rely in no way on the idea of two separate sovereigns—(1) the State of Georgia and (2) the United States of America—to allow this prosecution to proceed. But we do note that some question exists about when state officer misconduct would, as a matter of law, completely bar a federal prosecution.