ORDER
 

 BOWEN, District Judge.
 

 Following a lengthy trial in the above-captioned criminal cases, the jury returned the following verdicts with respect to the above-named defendants on October 3, 1981: (1) defendant Robert A. Holliday was found not guilty of the charge alleged against him in Count One of indictment number 181 — 26 and was found not guilty of the charges alleged against him in Counts One, Two, Five and Six of indictment number 181-37; (2) defendant Harvey E.
 

 Hornsby was found not guilty of the charge alleged against him in Count One of indictment 181-26 and was found not guilty of the charges alleged against him in Counts One, Two, Five, Six, Nine and Ten of indictment number 181-37; and (3) defendant Anthony T. Mulherin, Jr. was found not guilty of the charges alleged against him in Counts Five, Six and Seven of indictment number 181-37. All remaining defendants were acquitted.
 

 The jury was unable to reach a verdict on several of the counts as to defendants Anthony T. Mulherin, Jr., Harvey E. Hornsby and Robert A. Holliday and the Court declared a mistrial: (1) on Counts One, Two, Three, Four and Five of indictment number 181 — 26 and Counts Eight, Nine and Ten of indictment number 181-37 as to defendant Anthony T. Mulherin, Jr.; (2) on Counts Two, Three, Four and Five of indictment number 181 — 26 and Counts Seven and Eight of indictment number 181-37 as to defendant Harvey E. Hornsby; and (3) on Count Two of indictment number 181-26 and Counts Three, Four, Seven and Eight of indictment number 181-37 as to defendant Robert A. Holliday. These defendants have been set for retrial. Fed.R.Crim.P. 31(b).
 

 The case is presently before the Court on the following post-trial motions filed on be
 
 *916
 
 half of defendants Anthony T. Mulherin, Jr., Robert A. Holliday and Harvey E. Hornsby:
 

 1. Motion for judgment of acquittal notwithstanding the mistrial, with supplemental brief.
 

 2. Motion to reconsider order on motion to dismiss for failure of the government to comply with the Speedy Trial Act and motion to dismiss because of governmental vindictiveness.
 

 3. Motion for reconsideration of the Court’s orders on (a) motion to dismiss indictments because of governmental misconduct, (b) motion to dismiss indictments against defendants for prosecutorial misconduct before the grand jury based on the failure of the government to disclose to the grand juries exculpatory material and (c) motion to require copies of the grand juries’ minutes to be transcribed, produced for the defendants and made a part of the record.
 

 4. Motion for additional discovery and supplemental motion for additional discovery. These discovery motions will be considered by separate order.
 

 Several of these motions share common grounds and, for organizational purposes of this order, the Court will consider the motions according to the grounds asserted rather than the particular title of a motion. The substantive motions may be categorized into a single group, having a varied subset of supportive arguments and claims:
 

 Motion for judgment of acquittal, or, in the alternative for dismissal of one or both of the indictments
 

 GROUNDS:
 

 1. Verdicts returned by the jury are inconsistent and repugnant to any alleged guilt of defendants on the remaining charges.
 

 2. Renewal of motion for judgment of acquittal made at the close of the government’s cases and at the conclusion of trial.
 

 3. Speedy Trial Act violation in bringing indictment number 181-37.
 

 4. Governmental vindictiveness in bringing indictment number 181-37.
 

 5. Prosecutorial misconduct before the grand jury.
 

 6. Governmental misconduct (due process violation — entrapment as a matter of law).
 

 7. Double jeopardy violation on the following bases:
 

 (a) Counts One and Two of indictment number 181-26 charge a “unified conspiracy.”
 

 (b) Collateral estoppel.
 

 (c) Prosecutorial misconduct.
 

 “INCONSISTENT VERDICTS”
 

 Defendants Anthony T. Mulherin, Jr., Robert A. Holliday and Harvey E. Hornsby seek judgment of acquittal notwithstanding the mistrial on the basis that the not guilty verdicts returned by the jury are “inconsistent and repugnant” to any alleged guilt of the defendants. In sum, defendants argue that, since they admitted the underlying acts alleged in the indictments and relied solely on the defense of entrapment, the acquittals evidence a jury finding of entrapment and thereby render inconsistent the remaining allegations of guilt.
 

 This argument is grounded on the erroneous premise that jury verdicts returned in a multicount-multidefendant criminal trial must evince an intrinsic consistency. The rule of law is well settled to the contrary — that, “[wjhile symmetry of result may be intellectually satisfying,”
 
 Standefer v. United States,
 
 447 U.S. 10, 25, 100 S.Ct. 1999, 2008, 64 L.Ed.2d 689 (1980), consistency in criminal verdicts is not required.
 
 United States v. Fuiman,
 
 546 F.2d 1155, 1157 (5th Cir. 1977)
 
 cert. denied
 
 434 U.S. 856, 98 S.Ct. 176, 54 L.Ed.2d 127 (citing
 
 Dunn v. United States,
 
 284 U.S. 390, 393, 52 S.Ct. 189, 190, 76 L.Ed. 356 (1932));
 
 see United States v. Bottom,
 
 638 F.2d 781, 784 (5th Cir. 1981). As recently noted by the Fifth Circuit, criminal juries “are free to render ‘not guilty’ verdicts resulting from compromise, confusion, mistake, leniency or other legally and logically irrelevant factors.”
 
 United States v. Espinosa-Cerpa,
 
 630
 
 *917
 
 F.2d 328, 332 (5th Cir. 1980). While somewhat “discomforting,”
 
 see Standefer,
 
 447 U.S. at 25, 100 S.Ct. at 2008, it is clear that “ ‘juries may indulge in precisely such motives or vagaries’.”
 
 United States v. Cargo Service Stations, Inc.,
 
 657 F.2d 676, 684 (5th Cir. 1981) [quoting
 
 United States v. Dotterweich,
 
 320 U.S. 277, 279, 64 S.Ct. 134, 135, 88 L.Ed. 48 (1943)].
 

 Given the wide latitude accorded criminal juries in deriving verdicts of not guilty, it is apparent that “an acquittal is not to be taken as the equivalent of a finding of the fact of innocence; nor does it necessarily even reflect a failure of proof on the part of the prosecution.”
 
 United States v. Espinosa-Cerpa,
 
 630 F.2d at 332; see
 
 generally United States v. Benton,
 
 637 F.2d 1052,1058 (5th Cir. 1981). In this case, therefore, it is by no means a certainty that, in reaching its verdict of “not guilty” on various of the counts against defendants Anthony T. Mulherin, Jr., Holliday and Hornsby, the jury concluded that these defendants were victims of entrapment. To paraphrase the
 
 Espinosa-Cerpa
 
 court,
 
 supra,
 
 the jury could have premised its “not guilty” verdicts on mistake, sympathy, leniency or other logically irrelevant factors. Thus, the acquittals returned by the jury are not necessarily inconsistent with the remaining allegations of guilt against defendants. Furthermore, even if an apparent logical inconsistency existed, this would not provide a basis for attacking an otherwise valid retrial and, where adequately supported by the evidence, a conviction on the remaining counts.
 
 See United States v. Elliot,
 
 571 F.2d 880, 887 n.5 (5th Cir.),
 
 cert. denied,
 
 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978) (acquittal on a substantive offense does not preclude a verdict of guilty on count charging conspiracy to commit such substantive offense).
 

 Accordingly, defendants’ motions for judgment of acquittal on this basis are DENIED.
 

 Renewal of motions for judgment of acquittal made at trial
 

 At the close of the government’s case, defendants Anthony T. Mulherin, Jr., Holliday and Hornsby, by oral motion, sought judgment of acquittal pursuant to Fed.R.Crim.P. 29(a). Following a lengthy hearing, outside the presence of the jury, the Court denied these motions. Similarly, after due consideration, the Court denied the motions at the conclusion of trial. In the present renewal of these motions, defendants make no new arguments which would cause the Court to reconsider its pri- or rulings.
 

 Accordingly, the renewal of the motions for judgment of acquittal filed on behalf of defendants Anthony T. Mulherin, Jr., Harvey E. Hornsby and Robert A. Holliday are DENIED.
 
 See United States v. Becton,
 
 632 F.2d 1294, 1295 (5th Cir. 1980) (“[J]udges are not to acquit unless the government has clearly failed to produce evidence supporting a conviction when viewed most favorable to the prosecution.”);
 
 United States v. Herberman,
 
 583 F.2d 222, 231 (5th Cir. 1978) (“[A] trial judge has a duty to grant the motion for judgment of acquittal when the evidence, viewed in the light most favorable to the government, is so scant that the jury could only speculate as to defendant’s guilt.”);
 
 United States v. Brown,
 
 587 F.2d 187, 190 (5th Cir. 1979) (“It is not properly the function of the court, in ruling on [a motion for judgment of acquittal], to assess the credibility of witnesses, weigh the evidence, or substitute its own judgment as to guilt or innocence for that of the jury.”).
 
 See generally United States v. Burns,
 
 597 F.2d 939, 940 (5th Cir. 1979).
 

 “Speedy Trial Act violation in bringing indictment number 181-37”
 

 By written order entered September 2, 1981, the Court considered at length defendants’ contention that indictment number 181-37 failed to conform with the requirements of the Speedy Trial Act. 18 U.S.C. §§ 3161(b), 3162(a). The Court found that indictment number 181-37, returned on July 20, 1981, was timely under section 3161(b). Defendants’ motion for reconsideration of this ruling, currently pending, presents no new arguments. Accord
 
 *918
 
 ingly, the motion for reconsideration of the Court’s ruling on defendants’ motion to dismiss indictment number 181 — 37 pursuant to 18 U.S.C. § 3162(a)(1) is DENIED.
 

 “Governmental vindictiveness in bringing indictment number 181-37”
 

 Defendants Anthony T. Mulherin, Jr., Robert A. Holliday and Harvey E. Hornsby were charged, along with certain other defendants, in a five-count indictment returned on April 30, 1981, in United States District Court for the Middle District of Florida. Counts One and Two of this indictment, number 181-26, alleged conspiracy, 18 U.S.C. § 371, 21 U.S.C. § 846, and Counts Three through Five alleged certain substantive offenses committed in Florida. By order entered June 16, 1981, granting defendants’ motion pursuant to Fed.R. Crim.P. 21(b), the case was transferred to the Southern District of Georgia.
 

 On July 20, 1981, in the Southern District of Georgia, the indictment in criminal action 181-37 was returned by the grand jury. The indictment contained eleven counts (one count was later dismissed by the Court) alleging possession and transfer of various unregistered firearms in violation of 26 U.S.C. §§ 5861(d), 5861(e). The criminal offenses alleged in the indictment are in part the underlying substantive offenses for the criminal conspiracy charge in Count Two of indictment 181-26. Indeed, several of the factual allegations made in indictment 181-37 parallel the alleged overt acts enumerated in Count Two of indictment 181-26.
 

 As noted earlier, at the conclusion of the trial on both indictments, the jury acquitted defendants Anthony T. Mulherin, Jr., Harvey E. Hornsby and Robert A. Holliday on several of the charges alleged in indictment 181-37. Since the jury was unable to reach a unanimous verdict on the remaining counts, the Court declared a mistrial, and defendants now seek dismissal of those counts of indictment 181-37 on the basis of prosecutorial vindictiveness.
 

 Defendants’ argument is based on two decisions of the Supreme Court,
 
 North Carolina v. Pearce,
 
 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969);
 
 Blackledge v. Perry,
 
 417 U.S. 21, 94 S.Ct. 2098, 40 L.Ed.2d 628 (1974), and their progeny, which establish the principle “that the substantial discretion traditionally accorded state prosecutors in bringing defendants to trial on criminal charges is subject to the due process guarantees of the Fourteenth Amendment.”
 
 Miracle v. Estelle,
 
 592 F.2d 1269, 1272 (5th Cir. 1979).
 
 See Longval v. Meachum,
 
 651 F.2d 818, 820 (1st Cir. 1981);
 
 United States v. Hollywood Motor Car Co., Inc.,
 
 646 F.2d 384, 386 (9th Cir. 1981);
 
 United States v. Andrews,
 
 633 F.2d 449, 452 (6th Cir. 1980) (en banc),
 
 cert. denied,
 
 450 U.S. 927, 101 S.Ct. 1382, 67 L.Ed.2d 358 (1981);
 
 United States v. Burt,
 
 619 F.2d 831, 836 (9th Cir. 1980);
 
 Hardwick v. Doolittle,
 
 558 F.2d 292, 301 (5th Cir.),
 
 on petition for rehearing and rehearing en banc,
 
 561 F.2d 630 (1977),
 
 cert. denied,
 
 434 U.S. 1049, 98 S.Ct. 897, 54 L.Ed.2d 801 (1978). Succinctly stated, the traditional discretion accorded a prosecutor’s charging decision,
 
 see United States v. Cox,
 
 342 F.2d 167 (5th Cir.) (en banc),
 
 cert. denied,
 
 381 U.S. 935, 85 S.Ct. 1767, 14 L.Ed.2d 700 (1965), runs afoul of a defendant’s right to due process of law “where the Government increases the severity [or number] of alleged charges in response to the exercise of constitutional or statutory rights.”
 
 United States v. Hollywood Motor Car Co., Inc.,
 
 646 F.2d at 386.
 

 In order to place defendants’ contention in the proper analytical framework — and at the risk of reciting familiar law — it is necessary to delineate the progression of Supreme Court and Fifth Circuit precedent which articulate and develop the due process constraints on prosecutorial vindictiveness. Vindictiveness, as a violation of the due process clause, first arose in the context of court, as opposed to prosecutorial, action. In
 
 North Carolina v. Pearce,
 
 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969), the Supreme Court held that, when a defendant successfully appeals his first trial and is subsequently convicted upon retrial, the trial judge may not impose a more severe sentence than imposed following the first
 
 *919
 
 trial unless the second sentence is “based upon objective information concerning identifiable conduct on the part of the defendant occurring after the time of the original sentencing proceeding.”
 
 Id.
 
 at 726, 89 S.Ct. at 2081.
 

 The Court premised its holding on two tenets subsumed within the due process clause:
 

 Due process of law . . . requires that
 
 vindictiveness
 
 against a defendant for having successfully attacked his first conviction must play no part in the sentence he receives after a new trial. And since the fear of such vindictiveness may unconstitutionally deter a defendant’s exercise of the right to appeal or collaterally attack his first conviction, due process also requires that a defendant be
 
 freed of apprehension
 
 of such a retaliatory motivation on the part of the sentencing judge.
 

 Id.
 
 at 725, 89 S.Ct. at 2080 (emphasis added). Thus, on a twofold basis, the due process clause delimits the sentencing discretion of a judge after retrial on remand from a successful appeal: (1) due process proscribes any judicial retaliation for defendant’s exercise of his statutory or constitutional rights, and (2) due process requires that, in pursuing his rights, a defendant must be free of an apprehension of retaliation.
 

 While
 
 Pearce,
 
 in the context of resentencing, was subsequently limited to its facts,
 
 see Chaffin v. Stynchcombe,
 
 412 U.S. 17, 93 S.Ct. 1977, 36 L.Ed.2d 714 (1973)
 
 (Pearce
 
 held inapplicable where sentencing process is by the jury);
 
 Colten v. Kentucky,
 
 407 U.S. 104, 92 S.Ct. 1953, 32 L.Ed.2d 584 (1972) (holding greater sentencing by different judge on trial
 
 de novo
 
 did not violate due process clause), its underlying rationale was extended to the other side of the bench in
 
 Blackledge v. Perry,
 
 417 U.S. 21, 94 S.Ct. 2098, 40 L.Ed.2d 628 (1972).
 
 Blackledge
 
 concerned a defendant convicted in a state district court on a misdemeanor charge of assault with a deadly weapon. Following his conviction, defendant exercised his statutory right to obtain a trial
 
 de novo
 
 in a state court of general jurisdiction. Prior to the trial
 
 de novo,
 
 the prosecutor obtained an indictment from a grand jury charging defendant with the felony of assault with a deadly weapon with intent to kill and inflict serious bodily injury.
 

 In affirming the issuance of a writ of habeas corpus, the
 
 Blackledge
 
 Court concluded that
 
 Pearce
 
 precludes a prosecutor from retaliating against a defendant for the exercise of his statutory right to appeal. Writing for the Court, Justice Stewart noted that the central focus of the due process analysis in
 
 Pearce
 
 was on the “realistic likelihood of ‘vindictiveness’.”
 
 Id.
 
 at 27, 94 S.Ct. at 2102. Such a “realistic likelihood” was manifest in the return of the superseding indictment since the prosecutor had a “considerable stake” in discouraging convicted misdemeanants from appealing.
 
 Id.
 
 Recognizing that there was no evidence of “actual retaliatory motivation” on the part of the prosecutor, the Court bottomed its constitutional analysis on the second prong of the dual due process considerations set forth in
 
 Pearce-,
 
 “reasonable apprehension of retaliation.” Justice Stewart concluded:
 

 A person convicted of an offense is entitled to pursue his statutory right to a trial
 
 de novo, without apprehension
 
 that the State will retaliate by substituting a more serious charge for the original one, thus subjecting him to a significantly increased potential period of incarceration .... Due process of law requires that such a
 
 potential for vindictiveness
 
 must not enter into [a state’s] two-tiered appellate process.
 

 Id.
 
 at 28, 94 S.Ct. at 2102 (emphasis added).
 

 In considering
 
 Pearce
 
 and
 
 Blackledge,
 
 the Fifth Circuit endeavored to strike a balance between two antithetical, but constitutionally protected, interests:
 

 (1) the due process right of the defendant to be free of apprehension that the state might subject him to an increased potential punishment if he exercises his right to make a direct or collateral attack on his conviction, and (2) the prosecutor’s broad discretion to control the decision to prosecute.
 

 
 *920
 

 Miracle v. Estelle,
 
 592 F.2d at 1272. Like
 
 Blackledge,
 
 the Fifth Circuit formulated this balance of competing interests in the following archetypal context: indictment, conviction, successful appeal, reindictment on a new charge or additional charges, and conviction.
 
 See Id.
 
 at 1274. As gleaned from
 
 Hardwick
 
 v.
 
 Doolittle,
 
 558 F.2d 292 (5th Cir. 1977) and
 
 Jackson v. Walker,
 
 585 F.2d 139 (5th Cir. 1978), two seminal cases on “prosecutorial vindictiveness,” the concern of the Fifth Circuit, was to refine and limit to certain specific situations the
 
 per se
 
 rule enounced in
 
 Blackledge. See Jackson v. Walker,
 
 585 F.2d at 143.
 

 The analysis of the Court of Appeals is premised on the axiom that “once a prosecutor exercises his discretion to bring certain charges against a defendant, neither he nor his successor may, without explanation, increase the number of or severity of those charges in circumstances which suggest that the increase is retaliation for the defendant’s assertion of statutory or constitutional rights.”
 
 Hardwick v. Doolittle,
 
 558 F.2d at 301. Such an increase in the severity of the original charge subsequent to the successful exercise of defendant’s statutory or constitutional rights, accompanied by defendant’s claim of an apprehension of vindictiveness, establishes a prima facie case of vindictiveness.
 
 See Miracle v. Estelle,
 
 592 F.2d at 1275-76.
 

 Depending on the balance judicially derived between the defendant’s interest, in pursuing his statutory and constitutional rights, and the prosecutor’s interests, in maintaining the freedom of charging discretion, defendant may prevail on his prima facie case upon a court finding of: (1) “reasonable apprehension of vindictiveness,” where the balance favors defendant, or (2) “actual vindictiveness,” where the balance favors the prosecutor. The Fifth Circuit summarized the requisite balancing process as follows:
 

 In deciding whether to require a showing of actual vindictiveness [instead of a mere apprehension of vindictiveness], a court must weigh the extent to which allowing the second indictment will chill the exercise of the defendants’ appeal rights against the extent to which forbidding the second indictment will infringe on the exercise of the prosecutor’s independent discretion. In other words, the court must weigh the need to give defendants freedom to decide whether to appeal against the need to give the prosecutors freedom to decide whether to prosecute.
 

 Jackson v. Walker,
 
 585 F.2d 139, 145 (5th Cir. 1978).
 
 [1]
 

 In
 
 Blackledge,
 
 defendant’s interest in pursuing his statutory appeal right clearly outweighed any prosecutorial interest served by increasing the original charge. Hence, defendant prevailed upon a court determination that a reasonable apprehension of vindictiveness existed. The distinguishing feature of
 
 Blackledge
 
 was that, based upon a single criminal event — an assault — the prosecutor fully exercised his discretion and decided to charge a misdemeanor offense. After defendant’s appeal, however, the' prosecutor reopened that previously completed exercise of discretion,
 
 see Jackson v. Walker,
 
 585 F.2d at 144, and charged a felony offense based upon the same criminal episode. Since the prosecution’s initial charging discretion was unfettered, there was no prosecutorial interest served by the second charge to counterbalance the interests of defendant.
 

 
 *921
 
 Yet, in other “second charge” situations, the Supreme Court and the Fifth Circuit have indicated that the balance of competing interests favors the prosecutor. Such a favorable balance occurs when the second charge is possible only as a result of intervening events. See
 
 Blackledge v. Perry,
 
 417 U.S. at 29 n.7, 94 S.Ct. at 2103 n.7 (increasing charge to homicide upon subsequent death of assault victim). Similarly, the prosecutor’s interests outweigh defendant’s interests when the second, more severe, charge relates to “different and distinct” criminal activities, from the acts covered in the first charge, even though the criminal events occurred in the same overall time interval.
 
 See Hardwick v. Doolittle,
 
 558 F.2d at 302. Furthermore, the balance favors the prosecutor when the second charge is for different and distinct offenses which are a “different and distinct consequence” of the
 
 same
 
 basic criminal conduct alleged in the first charge.
 
 See Jackson v. Walker,
 
 585 F.2d at 147.
 

 As in the foregoing examples, when the balance of competing interests favors the prosecutor, defendant’s prima facie showing of vindictiveness merely shifts the burden to the prosecutor to show that the motive in bringing the second charge was not vindictive.
 
 See Miracle v. Estelle,
 
 592 F.2d at 1274. Once the prosecutor demonstrates legitimate reasons for the second charge,
 
 see Hardwick v. Doolittle,
 
 558 F.2d at 301 (for a nonexhaustive list of such nonvindietive reasons), then the burden shifts to defendant to demonstrate “actual vindictiveness” on the part of the prosecutor in order to prevail.
 
 See Jackson v. Walker,
 
 585 F.2d at 148.
 

 The present case presents a unique setting for application of the
 
 HardwickJackson
 
 balancing analysis. To begin with, the statutory right successfully exercised by defendants was a pre-trial change of venue, discretionary with the Court, rather than a Blackledge-type post-trial appeal of right. Moreover, following the venue change, the government
 
 added
 
 additional substantive charges arising out of the same overall conduct for which defendants had been originally charged for conspiracy and certain substantive counts occurring in Florida. In contrast to
 
 Blackledge,
 
 the prosecutor did not
 
 substitute
 
 a more severe charge for a less severe charge. Indeed, the second charge, in and of itself, is less severe than the first charge. Finally, the additional charges were brought by separate indictment, not by a superseding indictment, although the government clearly anticipated a trial together of the two indictments. While these factors do not negate due process questions raised by the second indictment, they eliminate applicability of the
 
 Blackledge per se
 
 rule and provide a significant government counterweight in the balance of competing interests.
 

 The initial inquiry on a claim of prosecutorial vindictiveness is whether the second charge is actually more severe than the first charge.
 
 See Jackson v. Walker,
 
 585 F.2d at 146 (“[T]he
 
 sine qua non
 
 of a prosecutorial vindictiveness claim is that the second charge is in fact harsher than the first.”). Since severity is measured by the “potential punishment for the offense,”
 
 Miracle v. Estelle,
 
 592 F.2d at 1275, it is clear that the added substantive counts in indictment number 181-37, when viewed in combination with indictment number 181— 26, as a result of the government’s motion for trial together, constitute a more severe charge than that originally brought. Given the increased severity of the original charge subsequent to the change of venue, and in light of defendants’ claimed apprehension of vindictiveness, the Court finds a prima facie showing of prosecutorial vindictiveness.
 

 Having made this determination, the next issue “is whether, for a finding of unconstitutional vindictiveness, [the] [C]ourt will require a determination of actual vindictiveness, or just a finding of the reasonable apprehension of vindictiveness.”
 
 Jackson v. Walker,
 
 585 F.2d at 139. In deriving the pertinent standard, the Court must engage in the balancing of interests mandated by the
 
 Jackson
 
 court.
 

 
 *922
 
 This case involves two conspiracies and related substantive offenses allegedly committed over a span of several months in the Southern District of Georgia and the Middle District of Florida. Under constitutional and statutory venue provisions, the government could indict for the substantive offenses only in the district in which such crimes were committed,
 
 see United States v. White,
 
 611 F.2d 531, 534 (5th Cir.),
 
 cert. denied,
 
 446 U.S. 992, 100 S.Ct. 2978, 64 L.Ed.2d 849 (1980), while indictment for the alleged conspiracies could be brought in either district.
 
 See United States v. DeLeon,
 
 641 F.2d 330, 336 (5th Cir. 1981).
 

 It is clear that on April 30, 1981, the government made the initial decision to prosecute the defendants for the alleged substantive offenses committed in the Middle District of Florida and for two counts of conspiracy. Yet, in making this decision, the government did not exhaust the full range of its charging discretion. Regardless of the disposition of indictment 181-26, the government maintained the discretion to seek an indictment in the Middle District of Georgia for the alleged substantive offenses committed therein.
 
 See United States v. Mulherin,
 
 521 F.Supp. 824, at 826-827 (S.D.Ga.1981). On these facts, then, the interest of the prosecutor is akin to that articulated in
 
 Hardwick:
 
 the discretion to institute a new prosecution when a defendant is initially indicted for less than all the distinct violations arising from his alleged criminal activity.
 
 See Hardwick v. Doolittle,
 
 558 F.2d at 302 (finding this interest sufficient to require showing of actual vindictiveness).
 
 See also Miracle v. Estelle,
 
 592 F.2d at 1276 (“[The government’s] adopting of a ‘different approach to prosecutorial duty’ is a critical facet of prosecutorial freedom and its presence tipped the scales in favor of the prosecution.”)
 

 Counterbalanced against this interest is defendants’ interest to be free from any chilling effect upon the exercise of their statutory venue rights engendered by the prosecutorial action. An initial, and in this case dispositive, focus, in assessing the relative weight of this interest, is on the nature of the “right” asserted. Here, the right to file a motion for change of venue pursuant to Fed.R.Crim.P. 21(b) is entirely distinct from the right to appellate review at issue in
 
 Blackledge, Jackson
 
 and
 
 Hardwick.
 
 With respect to avenues of appellate review in criminal cases, “it is . . . fundamental that, once established, these avenues must be kept free of unreasoned distinctions that can only impede open and equal access to the courts.”
 
 Blackledge v. Perry,
 
 417 U.S. at 25 n.4, 94 S.Ct. at 2101 n.4. In contrast, the grant or denial of a Rule 21(b) motion for transfer to another district rests solely within the broad discretion of the district court.
 
 See United States v. Alvarado,
 
 647 F.2d 537, 539 (5th Cir. 1981);
 
 United States v. Juarez,
 
 573 F.2d 267, 280 (5th Cir.),
 
 cert. denied,
 
 439 U.S. 915, 99 S.Ct. 289, 58 L.Ed.2d 262 (1978).
 
 Cf. United States v. DeMarco,
 
 550 F.2d 1224 (9th Cir.),
 
 cert. denied,
 
 434 U.S. 827, 98 S.Ct. 105, 54 L.Ed.2d 85 (1977) (considering claim of prosecutorial vindictiveness where defendant in tax prosecution case exercised his
 
 absolute
 
 right to venue in district in which he resided pursuant to 18 U.S.C. § 3237(b)).
 

 Certainly, this pre-trial permissive Rule 21(b) option to seek change of venue is less “weighty” than the absolute right to criminal appellate review. When measured against the aforesaid prosecutorial interests in bringing the second charge, the interests of defendants arising under Rule 21(b) do not tip the
 
 Hardwick-Jackson
 
 scale in favor of defendants.
 
 See Jackson v. Walker,
 
 585 F.2d at 148 (“Under the circumstances of this case we find a very limited due process interest balanced against a moderate’s weights prosecutorial independence interest.”) Thus, defendants’ prima facie showing serves to shift the burden to the government to articulate a legitimate nonvindictive reason for bringing the second charge. If the government carries this burden, then defendants must demonstrate actual vindictiveness.
 

 At a pre-trial hearing on the issue of defendants’ Speedy Trial Act claim, the government stated, in response to questions by the Court, that the return of indictment
 
 *923
 
 181-37 was based upon the transfer of the ease to the Southern District of Georgia. The prosecutor could have brought the second charges at any time as a dual prosecution, but once the case was transferred, the government thought it more probable that the cases could be tried together. Defendants claim that this colloquy evidences a vindictive motivation on the part of the prosecutor.
 

 “Vindictiveness,” as that term is used in the context of a claim for prosecutorial vindictiveness, means the imposition of some punishment against defendant in retaliation for defendant’s exercise of a legal right.
 
 See United States v. Walker,
 
 514 F.Supp. 294, 311-12 (E.D.La.1981). In this case it is apparent, on review of the pre-trial hearing, that the government had an array of possible substantive charges for acts committed in two states and that the prosecution considered a two-district prosecution. Yet, for reasons based upon convenience, economics and prosecutorial resources, the government chose to bring an indictment in the Middle District of Florida. Once the case was transferred, these reasons for not pursuing a two-district prosecution were eliminated, and the government proceeded with the second indictment. Such reasons for bringing the second charge are legitimate and do not manifest a purposeful governmental retaliation for defendants’ exercise of a legal right.
 

 Given this legitimate nonvindictive reason for returning indictment number 181-37, the “[C]ourt should not interfere with the prosecutor’s exercise of discretion unless a determination of actual vindictiveness is made.”
 
 Jackson v. Walker,
 
 585 F.2d at 148. Here, the Court finds no evidence of actual prosecutorial vindictiveness in response to the change of venue. Accordingly, defendants’ motion to dismiss indictment number 181-37 on the basis of prosecutorial vindictiveness is DENIED.
 

 "Prosecutorial misconduct before the grand jury”
 

 Defendants seek dismissal of both indictments because of alleged prosecutorial misconduct before the grand jury, and assign as grounds: (1) failure to disclose to the grand jury evidence which was favorable to defendants; (2) failure to disclose to the grand jury evidence adverse to the credibility of certain government witnesses; (3) failure to disclose to the grand jury evidence supportive of defendants’ entrapment ■claim; and (4) there is “ample evidence” that certain key government witnesses perjured themselves during trial, thus, it can only be assumed that such witnesses perjured themselves before the grand jury.
 

 In assessing these grounds for dismissal, it is well settled that “ ‘an indictment valid on its face is not subject to challenge on the ground that the grand jury acted on the basis of inadequate or incompetent evidence’.”
 
 United States v. Sullivan,
 
 578 F.2d 121, 124 (5th Cir. 1978) (quoting
 
 United States v. Calandra,
 
 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974)); see
 
 United States v. Georgalis,
 
 631 F.2d 1199, 1206 (5th Cir. 1980);
 
 United States v. Johnson,
 
 615 F.2d 1125, 1127 (5th Cir. 1980). Furthermore, “[t]he Government is under no duty to present to a grand jury evidence bearing on the credibility of witnesses,”
 
 United States v. Brown,
 
 574 F.2d 1274,1276 (5th Cir. 1978),
 
 cert. denied,
 
 439 U.S. 1046, 99 S.Ct. 720, 58 L.Ed.2d 704. Additionally, “an indictment is [not] flawed simply because it is based on testimony that later may prove to be questionable.”
 
 United States v. Sullivan,
 
 578 F.2d at 124. Finally, dismissal of an indictment on the basis of prosecutorial misconduct is required only in “flagrant” cases — “[i]t must be shown that the prosecutor’s conduct significantly infringed upon the ability of the grand jury to exercise its independent judgment.”
 
 United States v. Cederquist,
 
 641 F.2d 1347, 1353 (9th Cir. 1981).
 

 In light of these authorities, the Court finds no basis for dismissal of the indictments on the above-enumerated grounds, one through three. With respect to ground number four, the Fifth Circuit has indicated that proof of actual perjury before the grand jury by a government
 
 *924
 
 witness may provide a basis for dismissing a returned indictment.
 
 See United States v. Cathey,
 
 591 F.2d 268, 272 (5th Cir. 1979). The Court,
 
 in camera,
 
 has thoroughly reviewed the transcribed testimony of government witnesses before the grand jury, with careful attention to the testimony of special employee Gary A. Peacock. Of course, all the testimony was on direct examination and essentially consisted of a narrative of the alleged criminal activity. The Court finds no evidence of perjury.
 

 Accordingly, defendants’ motion to dismiss the indictments on the basis of prosecutorial misconduct before the grand jury is DENIED. FURTHER ORDER that defendants’ motion for production of the transcribed proceedings before the grand jury is DENIED.
 

 “Governmental misconduct (due process violation
 
 — entrapment
 
 as a matter of law)”
 

 By order entered August 27, 1981, the Court considered defendants’ motion to dismiss on grounds that the governmental involvement in the offenses charged reach such a demonstrable level of outrageousness as to bar prosecution on a due process basis. Defendants now urge the Court to reconsider its denial of the prior motion.
 

 On the basis of the law set forth in the Court’s earlier order, defendants’ motion for reconsideration is DENIED. However, the Court deems it appropriate — and perhaps essential, given the circumstances of this case — to set forth certain findings of fact regarding the conduct of the government from the inception of its undercover operation through the trial of these defendants. Since these findings are intertwined with, although legally distinct from, the required findings of the Court in considering defendants’ prosecutorial misconduct double jeopardy claim, the findings will be made under the final double jeopardy heading of this order.
 
 Cf. United States v. Rey,
 
 641 F.2d 222, 224 (5th Cir. 1981) (denial of due process claim is not subject to an interlocutory appeal).
 

 Double jeopardy violation on the following bases:
 

 (a) “Counts One and Two of indictment number 181-26 charge a ‘unified conspiracy’.”
 

 At the conclusion of the trial in this case, the jury returned a verdict of “not guilty” on the charges alleged against defendants Harvey E. Hornsby and Robert A. Holliday in Count One of indictment number 181-26. This count alleged conspiracy, under 21 U.S.C. § 846, to possess and to possess with intent to distribute controlled substances. The jury was unable to reach a unanimous verdict with respect to Hornsby and Holliday on the charge of conspiracy, under 18 U.S.C. § 371, to violate certain provisions of The National Firearms Act. Defendants Hornsby and Holliday now assert that retrial on Count Two is barred by the double jeopardy clause because “only one alleged agreement was in fact set out in Counts One and Two.”
 

 In considering a double jeopardy claim, the Supreme Court has noted that “the decisional law in the area is a veritable Sargasso Sea which could not fail to challenge the most intrepid judicial navigator.”
 
 Albernaz v. United States,
 
 450 U.S. 336,101 S.Ct. 1137, 1144, 67 L.Ed.2d 275 (1981). Yet, the Court has established certain beacons to guide the wayward judicial seafarer. As a general matter, the double jeopardy clause “ ‘protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the offense after conviction. And it protects against multiple punishments for the same offense’.”
 
 Id.
 
 101 S.Ct. at 1145 (quoting
 
 North Carolina v. Pearce,
 
 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969)). Here, defendants Hornsby and Holliday claim that a retrial on the charges alleged in Count One would constitute a prosecution on the same offense alleged in Count Two for which they were acquitted.
 

 A review of the Supreme Court’s decision in
 
 Albernaz
 
 last term shows that defendants’ argument is without merit.
 
 Albernaz v. United States,
 
 450 U.S. 336, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981). There, the
 
 *925
 
 Court considered whether cumulative punishment for a defendant convicted of conspiracy to import marihuana, in violation of 21 U.S.C. § 963, and of conspiracy to distribute marihuana, in violation of 21 U.S.C. § 846, was proscribed by the Fifth Amendment. In a footnote applicable to the issue in this case, Justice Rehnquist commented:
 

 Petitioners’ contention that a single conspiracy which violates both § 846 and § 963 constitute the “same offense” for double jeopardy purposes is wrong. We noted in
 
 Brown v. Ohio,
 
 [432 U.S. 161, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977)], that the established test for determining whether two offenses are the “same offense” is the rule set forth in
 
 Blockburger [v. United States,
 
 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 520 (1932) ] — the same rule on which we relied in determining congressional intent .... [Conspiracy to import marijuana in violation of § 963 and conspiracy to distribute marijuana in violation of § 846 clearly meet the
 
 Block-burger
 
 standard.
 
 It is well settled that a single transaction can give rise to distinct offenses under separate statutes without violating the Double Jeopardy Clause
 
 ....
 
 This is true even though the “single transaction” is an agreement or conspiracy.
 

 Id.
 
 101 S.Ct. at 1145 n. 3 (citations omitted) (emphasis added).
 
 Cf. United States v. Henry,
 
 661 F.2d 894, at 897 (5th Cir. 1981) (holding that, for successful double jeopardy claim on two overlapping drug conspiracy charges under section 846, “the evidence must show that the participants shared a continuing, common illegal goal and that the operations of the conspiracy followed an unbroken, repetitive pattern.”)
 
 United States v. Futch,
 
 637 F.2d 386 (5th Cir. 1981) (first and second indictment charged section 846 conspiracy);
 
 United States v. Marable,
 
 578 F.2d 151 (5th Cir. 1978) (same section 846 conspiracy charged in both indictments but for different controlled substances);
 
 United States v. Ruigomex,
 
 576 F.2d 1149 (5th Cir. 1978) (two indictments charged single, continuing conspiracy to purchase and distribute marihuana).
 

 In the present case, the two conspiracy counts in indictment 181-26 allege violations of separate statutes. The elements of conspiracy under section 846 of Title 21 are: (1) that two or more persons in some way or manner, positively or tacitly, came to a mutual understanding to try to accomplish a common and unlawful plan to distribute and possess with intent to distribute a controlled substance; and (2) that the defendant knowingly and willfully became a member of the conspiracy. In contrast, the elements of conspiracy under section 371 of Title 18: (1) that two or more persons, in some manner, whether positively or tacitly, came to a mutual understanding to try to accomplish a common and unlawful plan — in this case to violate certain provisions of The National Firearms Act; (2) that the defendant knowingly and willfully became a member of such conspiracy; (3) that one of the conspirators during the existence of the conspiracy knowingly committed at least one of the overt acts described in the indictment; and (4) that such overt act was knowingly committed in furtherance of the conspiracy. Thus, to borrow the language of
 
 Albernaz,
 
 even if the underlying acts alleged in counts one and two constitute a single transaction, such acts gave rise to distinct offenses under separate statutes which required proof of different facts and elements.
 
 See United States v. Colmenares-Hernandez,
 
 659 F.2d 39, at 43 (5th Cir. 1981) (“If one charge requires proof of a fact not required for the other charge, double jeopardy does not apply.”);
 
 United States v. Anderson,
 
 651 F.2d 375, 378-79 (5th Cir. 1981);
 
 United States v. Martino,
 
 648 F.2d 367, 382-83 (5th Cir. 1981).
 

 Accordingly, the motion of defendants Hornsby and Holliday for “judgment of acquittal” on Count Two of indictment number 181-26 is DENIED.
 

 (b) “Collateral estoppel”
 

 While “collateral estoppel” has been termed an “awkward phrase,”
 
 Ashe v. Swenson,
 
 397 U.S. 436, 443, 90 S.Ct. 1189, 1194, 25 L.Ed.2d 469 (1970), and its doctrine
 
 *926
 
 has been characterized as a “slippery concept indeed,”
 
 United States v. Mock,
 
 604 F.2d 341, 343 (5th Cir. 1979), it is firmly established that the law of collateral estoppel in a criminal case “is a protection embodied in the fifth amendment guarantee against double jeopardy.”
 
 United States v. Henry,
 
 661 F.2d 894, at 897 (5th Cir. 1981). As defined by the Supreme Court, collateral estoppel “means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit.”
 
 Ashe v. Swenson,
 
 397 U.S. at 443, 90 S.Ct. at 1194. The concept is distinct from double jeopardy in the sense that “the traditional bar of double jeopardy prohibits the prosecution of the crime itself, whereas collateral estoppel, in a more modest fashion, simply forbids the government from relitigating certain facts in order to establish the fact of the crime.”
 
 United States v. Mock,
 
 604 F.2d at 343-4'4.
 
 See United States v. Caucci,
 
 635 F.2d 441, 448 (5th Cir. 1981) (“Although double jeopardy necessarily includes collateral estoppel, collateral estoppel does not equate with or include double jeopardy.”).
 

 The doctrine of collateral estoppel may affect a subsequent criminal prosecution in two distinct ways:
 

 (1) it may completely bar a subsequent prosecution; or (2) although the subsequent prosecution may proceed, it may operate to bar the introduction or argumentation of certain facts necessarily established in a prior proceeding.
 

 United States v. Caucci,
 
 635 F.2d at 488; see
 
 United States v. De La Torre,
 
 639 F.2d 245, 248 (5th Cir. 1981) (“The doctrine affects the introduction of evidentiary facts necessarily determined in a prior lawsuit, as well as reprosecution.”). In this case, defendants seek to invoke collateral estoppel to preclude the government from instituting a reprosecution or, in the alternative, to prevent the relitigation of certain evidentiary facts which the jury determined adversely to the prosecution. Of immediate importance, for present purposes, is whether the doctrine of collateral estoppel serves as a bar to retrial of defendants on the mistried counts. In the event of retrial, the applicability of collateral estoppel to preclude the introduction or argumentation of certain facts necessarily established in the prior proceeding,
 
 see United States v. Lee,
 
 622 F.2d 787, 790 (5th Cir. 1980), is properly determined on a defense motion in limine to suppress evidence.
 
 [2]
 

 See id.
 
 at 791 (“[A] question of the admissibility of evidence arising from the application of collateral estoppel is not an appealable order.”).
 

 In support of the collateral estoppel motion to bar retrial, defendants argue that, since they relied solely on the defense of entrapment, the “not guilty” verdicts on several counts demonstrate that the jury necessarily found that defendants were entrapped. Thus, it is contended that the government is collaterally estopped from contesting the issue of entrapment on the remaining counts for which a mistrial was declared, and, therefore, a reprosecution on these counts is barred.
 

 Before considering the merits of this argument, it is useful to first chronicle the proceedings in this case and then set the framework for the Court’s analysis of the collateral estoppel question. Defendants were tried in a single trial on two multicount-multidefendant indictments. The indictments alleged two conspiracies, 18 U.S.C. § 371 and 21 U.S.C. § 846, and numerous substantive offenses. The defense of entrapment was individually asserted by defendants Anthony T. Mulherin, Jr., Harvey E. Hornsby and Robert A. Holliday as to each of the counts against them. The jury acquitted defendants Holliday and Hornsby of the section 846 conspiracy allegation and of several substantive offense allegations. Defendant Anthony T. Mulhe
 
 *927
 
 rin, Jr., was acquitted of three substantive offense allegations. The jury was unable to reach a verdict on the two conspiracy counts against Anthony T. Mulherin, Jr. and the section 371 conspiracy count against defendants Hornsby and Holliday. Additionally, the jury was unable to reach a unanimous verdict on several of the substantive counts against the three defendants.
 

 While collateral estoppel ordinarily arises in the context of a subsequent prosecution for an offense, legally distinct from but factually similar to, an offense charged in a prior prosecution, it is settled that the doctrine also applies in the situation of a retrial on counts which were mistried in a prior proceeding on a multicount indictment where the jury hung on some counts and acquitted on the remaining counts.
 
 [3]
 

 See United States v. Larkin,
 
 605 F.2d 1360 (5th Cir. 1979),
 
 modified on rehearing,
 
 611 F.2d 585,
 
 cert. denied,
 
 446 U.S. 939, 100 S.Ct. 2160, 64 L.Ed.2d 793 (1980);
 
 United States v. Mespoulede,
 
 597 F.2d 329, 336-37 (2d Cir. 1979).
 
 Cf. United States v. Caucci,
 
 635 F.2d at 448 (holding that doctrine of collateral estoppel does not apply in the context of a single trial). In assessing defendants’ collateral estoppel claim:
 

 the court’s task is to decipher exactly what facts have been or should be deemed to have been determined at the first trial. In making such a determination the court should apply “realism and rationality,” and its inquiry “must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings.” The doctrine of collateral estoppel precludes the subsequent prosecution
 
 only if the jury could not rationally have based its verdict on an issue other than the one the defendant seeks to foreclose. When a “fact is not necessarily determined in a former trial, the possibility that it may have been does not prevent re-examination of that issue.”
 

 United States v. Lee,
 
 622 F.2d at 787 (citations omitted) (emphasis added);
 
 see United States v. Griggs,
 
 651 F.2d 396, 399 (5th Cir. 1981). The burden to establish that a fact was necessarily determined in a former trial rests with the defendant.
 
 United States v. Giarratano,
 
 622 F.2d 153, 156 n.4 (5th Cir. 1980).
 

 In the present case, the issue is whether the defense of entrapment asserted by defendants “should be deemed to have been determined at the first trial” in favor of defendants on all counts. Briefly stated, “entrapment occurs ‘when the criminal design originates with the officials of the Government, and they implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order that they may prosecute’.”
 
 United States v. Webster,
 
 649 F.2d 346, 348 (5th Cir. 1981) (en banc). “The visceral issue is whether the defendant had the intent or predisposition to commit the crime, a factual inquiry for jury resolution.”
 
 United States v. Bradsby,
 
 628 F.2d 901, 903 (5th Cir. 1980).
 

 Although the rule has been the subject of much criticism,
 
 see United States v. Brooks,
 
 611 F.2d 614, 618 (5th Cir. 1980), it is established in this circuit that, as a general principle, “a defendant cannot both plead entrapment and deny committing the acts on which the prosecution is predicated.”
 
 United States v. Sedigh,
 
 658 F.2d 1010, 1014-15 (5th Cir. 1981);
 
 see United States v. Greenfield,
 
 554 F.2d 179, 181 (5th Cir.),
 
 cert. denied,
 
 439 U.S. 860, 99 S.Ct. 178, 58 L.Ed.2d 168 (1978);
 
 United States v. Ramirez,
 
 533 F.2d 138, 141 (5th Cir.),
 
 cert. denied,
 
 429 U.S. 884, 97 S.Ct. 235, 50 L.Ed.2d 165 (1976). Of course, the admission of the physical acts alleged, as a predicate to pleading entrapment, “is not equivalent to a confession of guilt.”
 
 United States v. Sedigh,
 
 658 F.2d at 1015. More
 
 *928
 
 over, a defendant need not make an admission in all instances. The Fifth Circuit has recognized that “if the government’s own case in chief injects substantial evidence of entrapment into the case, the defendant is entitled to raise the defense of entrapment [and deny the acts charged].”
 
 United States v. Greenfield,
 
 554 F.2d at 182 (citing
 
 Sears v. United States,
 
 343 F.2d 139 (5th Cir. 1965)). Additionally, “the defense of entrapment is available where a defendant denies that he was a party to or knew of a conspiracy with which he is charged, but admits commission of one of the alleged overt acts.”
 
 Id.
 
 (citing
 
 Henderson v. United States,
 
 237 F.2d 169 (5th Cir. 1956)). Furthermore, the court of appeals has intimated that the defense of entrapment is not inconsistent with a defense of lack of criminal intent or guilty knowledge,
 
 id.
 
 at 183, that is, a defendant may plead entrapment and simultaneously claim that he lacked the requisite criminal intent as an element of the offense charged.
 

 It is important to note that the defense of entrapment does not relieve the government of the burden of proving every essential element of the offense charged beyond a reasonable doubt. This burden always remains with the prosecution. Once a defendant, pleading entrapment, carries his “initial burden of going forward with evidence of governmental involvement and inducement,”
 
 United States v. Wolffs,
 
 594 F.2d 77, 80 (5th Cir. 1979), then, the government must prove beyond a reasonable doubt that the defendant was predisposed to commit the crime charged.
 
 See United States v. Hill,
 
 626 F.2d 1301 (5th Cir. 1980);
 
 United States v. Dickens,
 
 524 F.2d 441 (5th Cir. 1975),
 
 cert. denied,
 
 425 U.S. 994, 96 S.Ct. 2208, 48 L.Ed.2d 819. Ordinarily, a prosecutor may not adduce proof of criminal predisposition,
 
 see United States v. Mack,
 
 643 F.2d 1119, 1121 (5th Cir. 1981); however, the defense of entrapment, when properly raised, effectively adds an element of “predisposition” to the other (statutory) essential elements of the offense charged.
 
 See generally United States v. Tobias,
 
 662 F.2d 381, at 384 (5th Cir. 1981). Of course, failure of the prosecution to prove
 
 any
 
 essential element beyond a.reasonable doubt directs an acquittal.
 

 Neither defendants nor the Court has found any federal case law considering the applicability of collateral estoppel to the issue of entrapment. Defendants, however, cite a decision of the New York Court of Appeals in support of their position. In
 
 People v. Smith,
 
 48 N.Y.2d 477, 423 N.Y. S.2d 862, 399 N.E.2d 894 (1979), defendant was on parole for a prior offense when he was subsequently indicted on new charges. Upon indictment, defendant was served with a parole violation notice based upon the same alleged offenses. At trial on the indictment, defendant asserted the defense of entrapment and was acquitted on
 
 all
 
 counts. Thereafter, at a parole revocation hearing, defendant invoked the doctrine of collateral estoppel, contending that his acquittal amounted to a complete defense to the parole violation charges. The New York Court of Appeals concluded that the doctrine of collateral estoppel applied with respect to the issue of entrapment and barred the Board of Parole from proceeding on the charges against defendant.
 

 Upon review of the
 
 Smith
 
 decision, it is clear that the court grounded its holding on the failure of the Parole Board and the state to contest in any fashion that defendant’s acquittal constituted a finding of entrapment.
 
 See People v. Smith,
 
 399 N.E.2d at 895 (“[F]or the purposes of the disposition of the present appeal we take it as established that the acquittal in. the criminal action did indeed constitute a determination that [defendant] had provided the affirmative defense of entrapment.”). The state appellate court never engaged in any
 
 Ashe
 
 mandated analysis.
 
 See United States
 
 v.
 
 Lee,
 
 622 F.2d at 790. One might conjecture that such a conclusional finding would not have been made if the jury in the criminal trial had acquitted on some counts and deadlocked on others.
 

 Unlike the truncated analysis of the
 
 Smith
 
 court, the task before the Court in this case is more formidable. The complexities and nuances of collateral estoppel in
 
 *929
 
 the context of a retrial on mistried counts are aptly described by Judge Goldberg:
 

 The intelligent application of collateral estoppel requires that we atomize the charges; we must examine the various counts, the testimony, the jury’s verdict. Each requires a parsing in comparison with the other in order to come to a conclusion whether or not collateral estoppel is applicable to one or more of the issues which are to be covered in the second trial.
 

 The complicating factors here are the multi-count indictment in the first trial, the inability of the jury to agree, and the findings by the jury of not guilty with respect to some aspects of the charges. But these complicating elements and components do not relieve us of our judicial duty to determine whether collateral estoppel is applicable to one or more of the components involved.
 

 While we do not test ourselves as three more jurors in the case, we are compelled to determine as best we can what makes the jury’s verdict cohere: The geodetics required of us is not an easy one; we must examine the record with great care.
 

 United States v. Larkin,
 
 605 F.2d at 1369. To aid the Court in the “geodetics” required of it, the following chart outlines the charges against the three defendants and the judgments entered based upon the verdicts returned by the jury.
 

 
 *930
 

 
 *931
 

 The foregoing results of defendants’ trial on the charges alleged in indictment numbers 181-26 and 181-37 suggest five possible permutations which may explain the manner in which a “rational”
 
 [4]
 
 jury could have proceeded:
 
 [5]
 

 (1) The government proved all statutory essential elements of the offense charged in each count, but, by unanimous finding, failed to prove predisposition beyond a reasonable doubt for the offense charged in the “not guilty” counts, and, by a finding of at least one but not all of the jurors, failed to prove predisposition beyond a reasonable doubt for the offenses charged in the “mistried” counts.
 

 (2) The government proved predisposition for the offense charged in each count, but, by unanimous finding, failed to prove at least one of the statutory essential elements of the offense charged in the “not guilty” counts beyond a reasonable doubt, and, by a finding of at least one but not all of the jurors, failed to prove at least one of the statutory essential elements of the offense charged in the “mistried” counts beyond a reasonable doubt.
 

 (3) The government proved all statutory - essential elements of the offense charged in the “not guilty” counts and proved predisposition for the offense charged in the “mistried” counts, but, by unanimous finding, failed to prove predisposition beyond a reasonable doubt for the offense charged in the “not guilty” counts and, by a finding of at least one but not all of the jurors, failed to prove at least one of the statutory essential elements of the offense charged in the “mistried” counts beyond a reasonable doubt.
 

 (4) The government proved predisposition for the offense charged in the “not guilty” counts and proved all the essential elements of the offense charged in the “mistried” counts, but, by unanimous find
 
 *932
 
 ing, failed to prove at least one of the statutory essential elements of the offense charged in the “not guilty” counts beyond a reasonable doubt, and, by a finding of at least one but not all of the jurors, failed to prove predisposition beyond a reasonable doubt for the offense charged in the “mistried” counts.
 

 (5) By unanimous finding, the government both failed to prove predisposition beyond a reasonable doubt for the offense charged in the “not guilty” counts and failed to prove at least one of the statutory essential elements of the offense charged in the “not guilty” counts beyond a reasonable doubt, and, by a finding of at least one but not all of the jurors, both failed to prove predisposition beyond a reasonable doubt for the offense charged in the “mistried” counts and failed to prove at least one of the statutory essential elements of the offense charged in the “mistried” counts beyond a reasonable doubt.
 

 On the basis of these possible jury findings, defendants urge that the government is collaterally estopped from retrying them on the mistried counts. Essentially, defendants’ argument is bottomed on the following syllogism: (a) the jury necessarily found that defendants were entrapped for the offenses charged in the “not guilty” counts; and (b) the fact or issue of entrapment is a constant, that is, it is identical for all counts (“Entrapment is entrapment is entrapment.” Defendants’ Supplemental Brief, at 11); therefore (c) the issue of entrapment was necessarily decided in favor of defendants on the “mistried” counts.
 

 This argument is faulty in several respects. To begin with, as a matter of actuality, the jury did not unanimously find that defendants were entrapped for the offense charged in the “mistried” counts. Otherwise, the jury would have acquitted on-these counts. Leaving the realm of actuality, however, the
 
 Ashe
 
 -type inquiry is whether the jury could have rationally based its “not guilty” verdict on an issue other than entrapment, and, if not, whether the issue of entrapment was necessarily determined adversely to the prosecution on all counts.
 

 The Court finds that the jury could rationally have based its acquittal on a finding other than the failure of the government to prove predisposition beyond a reasonable doubt. For example, with respect to the acquittal of defendants Hornsby and Holliday on the drug conspiracy charge alleged in Count One of indictment 181-26, the jury may have rationally concluded that neither Hornsby or Holliday intended to join and participate in an agreement to distribute or to possess with intent to distribute the controlled substances at issue. Similarly, the jury may have concluded that the weapon at issue in the possession and transfer Counts One, Two, Five and Six, of indictment 181-37 were not “firearms” within the proscriptive ambit of the National Firearms Act. Furthermore, the jury could have found that the government failed to prove the requisite element of possession beyond a reasonable doubt for the offense charged in Count Seven of indictment 181-37. Additionally, the jury could have determined that the government failed to prove the statutory essential elements for the possession and transfer charges alleged against defendant Hornsby in Counts Nine and Ten of indictment 181— 37 or failed to prove that Hornsby aided and abetted the offense charged.
 

 Even assuming, however, that the jury found that defendants were entrapped for some or all of the offenses charged in the “not guilty” counts, the Court is unwilling to adopt the monolithic characterization accorded the issue of entrapment by defendants. A rational jury could very well have determined that defendants Holliday and Hornsby were not predisposed to commit the drug conspiracy offense alleged in Count One, but were predisposed to commit the firearms conspiracy offense alleged in Two. Thus, a jury finding that the prosecution failed to prove predisposition beyond a reasonable doubt for an offense charged in one count does not necessarily mean that a “rational” jury would have found a similar failure of proof for an offense charged in a separate count.
 

 
 *933
 
 As a final matter, the Court notes that the complexities and unusual circumstances of this case militate against an application of collateral estoppel. The foregoing delineation of possible jury determinations based upon the verdicts returned reveals the impracticality, if not infeasibility, of adjudging what “facts” were resolved by the jury in favor of defendants. Certainly, the intangible fact of entrapment, which centers on the mental predisposition of defendant, is a less readily gleaned factual determination, upon review of a jury verdict, than a more corporeal fact, such as whether defendant committed a certain act or conducted himself in a particular way. Furthermore, the Court cannot ignore the indication of the jury’s deadlock that the government did not have a failure of proof on the issue of predisposition for all counts.
 

 Accordingly; based upon the foregoing findings, defendants’ motion for “judgment of acquittal” on the basis of collateral estoppel is DENIED.
 

 “Governmental and prosecutorial overreaching"
 

 Defendants maintain that the prosecutor’s gross negligence and intentional misconduct resulted in the “mistried” counts and therefore the double jeopardy clause bars retrial. The Court considered a claim of prosecutorial misconduct as a bar to retrial in another context and there stated the applicable law as follows:
 

 Prosecutorial misconduct as a bar to retrial has arisen when the first trial ends in mistrial.
 
 See, e.g., United States v. Kessler,
 
 530. F.2d 1246 (5th Cir. 1976). Ordinarily the double jeopardy clause does not preclude retrial when defendant requests and is granted a mistrial.
 
 See United States v. Dinitz,
 
 424 U.S. 600, 611 [96 S.Ct. 1075, 1081, 47 L.Ed.2d 267] (1976);
 
 United States v. Jorn,
 
 400 U.S. 470, 485 n.12 [91 S.Ct. 547, 557 n.12, 27 L.Ed.2d 543] (1971). If there is proof that the prosecutor’s bad faith conduct provoked the motion for mistrial, then policy considerations underpinning the double jeopardy clause bar retrial.
 
 See Hawk v. Berkemer,
 
 610 F.2d 445, 448 n.3 (6th Cir. 1979).
 

 The criteria to support a finding of prosecutorial overreaching are stringent.
 
 See
 
 616 F.2d at 234. “To find ‘prosecutorial overreaching,’ the Government must have, through ‘gross negligence or intentional misconduct,’ caused aggravated circumstances to develop which ‘seriously prejudice[d] a defendant’ causing him to ‘reasonably conclude that a continuation of the tainted proceeding would result in a conviction.’ ”
 
 United States v. Kessler,
 
 530 F.2d 1246, 1256 (5th Cir. 1976) (citation and footnote omitted).
 
 See United States v. Gaultney,
 
 606 F.2d 540 (5th Cir. 1979);
 
 United States
 
 v. Garza, 603 F.2d 578 (5th Cir. 1979). Mere negligence on the part of the government is insufficient.
 
 United States v. Luttrell,
 
 609 F.2d 1190, 1191 (5th Cir. 1980).
 

 United States v. Bizzard,
 
 493 F.Supp. 1084, 1087 (S.D.Ga.1980);
 
 see United States
 
 v.
 
 Westoff,
 
 653 F.2d 1047, 1049 (5th Cir. 1981);
 
 United States v. Charette,
 
 625 F.2d 57, 58 (5th Cir. 1980) (“[T]he ‘bad faith’ standard . . . requir[es] a finding of gross negligence or intentional misconduct on the part of the Government which has seriously prejudiced the defendant.”).
 

 Here, the prosecutorial misconduct claim does not arise in the context of a defense request for a mistrial. Rather, defendants seek a post-trial determination, following a hung-jury mistrial, that the prosecution was marred by gross negligence or intentional misconduct and that, as a result, the policy considerations underlying the double jeopardy clause preclude retrial. Whether this type of post-trial review at the trial court level,' assuming a finding of prosecutorial misconduct, would give rise to a double jeopardy bar is open to question. The Fifth Circuit recently indicated that the double jeopardy clause may not bar retrial when prosecutorial overreaching was the basis for appellate reversal.
 
 United States v. Opager,
 
 616 F.2d 231, 236 (5th Cir. 1980).
 

 Yet assuming the applicability of the double jeopardy bar to a post-trial de
 
 *934
 
 termination of prosecutorial misconduct, the Court finds that the requisite showing of gross negligence and intentional misconduct by the prosecution has not been made. In accordance with this determination and, as noted earlier, during the discussion of defendants’ due process claim, it is appropriate at this point in the present order to make certain findings of fact. As also discussed earlier, these findings subsume both the prosecutorial misconduct claim (double jeopardy) and the governmental misconduct claim (due process — entrapment as a matter of law).
 

 The Court perceives a distinction between the governmental misconduct of which the defendants previously complained and prosecutorial misconduct which they now contend. The former, if shown, would amount to a gross abuse of power or some other outrage so great as to make it unconscionable for the prosecution to proceed.
 
 See United States v. Tobias,
 
 662 F.2d 381, at 387 (5th Cir. 1981) (“[D]ue process can only be invoked in the rarest and most outrageous circumstances.”] The latter, if shown, would ordinarily amount to an unethical, unprofessional, or unfair tactic or strategy on the part of a lawyer representing the prosecution which is so prejudicial to the defense, and so improper, that the severe penalty of aborting the prosecution should be required. With respect to a consideration of either governmental or prosecutorial misconduct, one should note that the public and the courts expect that those who represent the sovereign should be exemplary in their acts and deeds, whether investigative or advocative.
 

 This district judge has observed the government agents and prosecutors involved with this case since the return of the indictments. I have presided over a trial which began on September 9 and lasted until October 3, 1981. Additionally, I have devoted a tremendous amount of out-of-court time to research and consideration of the many ancillary matters arising before and during trial. Upon the foregoing observations and considerations, I conclude without hesitation that there has been no prosecutorial misconduct as it is known in the usual sense. The government was represented throughout these cases by lead counsel Assistant United States Attorney Bernard S. McLendon. Mr. McLendon is a thorough, conscientious, and dedicated servant of this country; he has proved himself in all respects to be a gentleman. Undoubtedly, some mistakes were made — some are made in every trial, especially those which are lengthy. That Mr. McLendon was originally sent by the United States Attorney for the Middle District of Florida to try two multi-count indictments against thirteen defendants represented by eleven lawyers, many miles from his home district, alone and unaided, will not draw further comment. The concern of this Court is whether any attorney representing the government erred by undue zeal or improper motive. I conclude that none did. On the other hand, a more thorough discussion of alleged governmental misconduct should be had, especially as it becomes intertwined with the actions of the prosecutor. This should be developed in three stages. In that regard, certain additional findings should be made in light of the evidence adduced at the trial. They are enumerated herein for the purpose of appellate review should that become necessary.
 
 [6]
 

 
 *935
 
 I. MISCONDUCT OF GOVERNMENT AGENTS DURING THE INVESTIGATIVE PHASES OF THE PROSECUTIONS.
 

 The allegations of misconduct of government agents prior to arrest of the defendants has been considered in the prior Order denying the motion to dismiss the indict
 
 *936
 
 ments. There is one matter, however, which was insufficiently explored prior to trial, really insufficiently explored during trial, and which continues to cause me great concern. My concern and questions relate to the manner in which the Bureau of Alcohol, Tobacco and Firearms [ATF] agents in Miami originated a prosecution which extended to the Augusta, Georgia, area.
 

 Prior to the trial, there was testimony that Special Agent Snyder had recéived some information that firearms were coming from the Augusta, Georgia, area. During the trial, there was scant testimony on this subject. In an
 
 in camera
 
 session attended only by the court reporter, the district judge and Special Agent Bruce Snyder, the Court inquired further in this area. This inquiry was prompted by the Court’s review of certain financial files maintained by the ATF which seem to shed light on the origination of the prosecution.
 

 The
 
 in camera
 
 closed mid-trial session revealed that an underworld contact led Special Employee Peacock [MDO-080] to a conclusion that illegal firearms were coming from the Augusta, Georgia, area. It should be noted that Special Employee Peacock was already an acquaintance, indeed a friend, of the three “entrapment defendants.” Special Employee Peacock’s testimony is that he knew people in the Augusta, Georgia, area and that he contacted them in an effort to learn the origin of the illegal weapons. The file entries which Special Agent Snyder made when requesting authority to use some $5,000.00 of undercover funds were that the underworld connection had put Mr. Peacock in touch with the “entrapment defendants” who were in the illegal firearms business. This simply does not add up and gives rise to great suspicion about the very inception of the investigation and prosecution. The origin of the investigation as a valid effort in the search to root out and expose crime, is established by this evidence because there is none opposed to it. I am not satisfied, however, by clear and convincing evidence that the agents involved were doing anything other than looking for a place at which to begin their next undercover operation.
 

 This concern, of course, pales when one notes the eager reception which the “entrapment defendants” extended to the illegal scheme proposed by the agents. To a man, these defendants were ready to deal. Pale though it may, my concern does not disappear. As I understand the law of entrapment, the police officers must have some reason to begin their investigation, some suspicion of an illegal enterprise in progress; they cannot invent every phase of it.
 

 II. MISCONDUCT OF GOVERNMENT AGENTS PRIOR TO TRIAL.
 

 The second area of concern related to governmental misconduct which requires further exploration and comment is that of the agents after arrest and assisting the prosecutor up to the date of trial. At the trial, there was some evidence that a government agent engaged in an obstruction of justice by threatening a potential witness. The proof in this regard was slight and not entirely credible. Nevertheless, there was some evidence offered, and, despite denial by the government agents, a question lingers. This charge must figure into the eventual compendium of things.
 

 Of greater concern, however, is the actions of the case agent in providing assistance to the Assistant United States Attorney in preparing the case for trial. In August, during a pre-trial hearing, the Court directed that certain information would be filed with the Court for
 
 in camera
 
 inspection and possible dissemination to the defendants upon application of
 
 Brady
 
 principles. Some information trickled in. Assistant United States Attorney McLendon was advised by the Court that his submissions were not as complete and timely as expected. Mr. McLendon’s reply was that he could furnish only that information which was furnished to him by the case agent and other AFT personnel. Because of the late submission of many items and the lack of time which the Court had to make a meaningful
 
 in camera
 
 inspection and review of same toward disclosure of
 
 *937
 

 Brady
 
 materials, much of the files and information submitted to the Court at the last minute (less than a week prior to trial) were handed over by the Court to defense counsel. The reason for this disclosure was abundant caution. Based upon my conversations with Mr. McLendon, I am of the opinion that the assistance and cooperation given the Assistant United States Attorney by the case agent was less than one would expect from responsible, diligent government agents.
 

 Of greater concern yet is some of the testimony given prior to the trial by Special Employee Peacock. The Court and defense counsel questioned Mr. Peacock about the amounts of money which he had received as rewards from the DEA and the ATF. The amount of rewards would ordinarily gain little attention in such a trial, but here, because of the way that the questions were handled by government employees and agents, they became a central issue. Mr. Peacock, a resident of Florida, testified that he had filed timely tax returns disclosing all receipts of any reward monies by him since 1977 when he began to work for the DEA and ATF. During the course of the trial, at the insistence of defense counsel, I issued subpoenas to the district disclosure officer of the Internal Revenue Service and required the attendance of a witness at the trial from Atlanta. Ms. Barbara Lane, an IRS employee, testified that she had made two computer checks in the Atlanta district (which covers Florida) and a nationwide check. These checks were conducted at my request and disclose that Gary Peacock has filed no federal income tax return within the past ten years. Some weak explanation of the variance in Mr. Peacock’s testimony and the IRS testimony was attempted but ineffectively so. This Court holds the firm present opinion that Mr. Peacock has not filed his tax return and that he lied when he stated that he had. It would seem that if any agency of the government could explain such a difficulty effectively, the ATF, which is a division of the Department of the Treasury, would be that one. It should be noted that this misconduct relates directly to Mr. Peacock’s credibility and not directly to any issue of the contended entrapment.
 

 III. MISCONDUCT OF GOVERNMENT ' AGENTS DURING AND AFTER THE TRIAL.
 

 The third concern for governmental misconduct is the area which occurred during and after the trial. Special Agent Bruce Snyder is the senior special agent and case agent in these prosecutions. He testified before this Court on August 11,1981, on the issue of governmental misconduct. At that time he gave testimony that Mr. Peacock had not been recommended for any specific amount of a reward. During the course of the trial, in a continuing search for
 
 Brady
 
 material, the Court received from the District Director of the ATF various files and memoranda from both the Miami and Atlanta offices of the ATF. Information gained from these sources indicated that in early August, some few days before Mr. Snyder’s aforementioned testimony, he had recommended Mr. Peacock for a reward in the amount of $10,000.00. In other testimony, Mr. Snyder, during the course of the trial, stated that he expected that the reward would be recommended for some $4,000.00 to $5,000.00. Mr. Snyder attempted an explanation of this inconsistency, but it became worse in his doing so. Mr. Snyder is an agent with many years experience, and his oath and obligation was to tell the truth, the whole truth, and nothing but the truth. I am clearly convinced that he did not entirely fulfill the oath he took.
 

 Some of the foregoing events necessarily involve the prosecuting lawyers in that they unavoidably affected what the lawyers did during trial and the positions taken in attempting to prosecute the “entrapment defendants.” To the extent that the misconduct of government agents is reflected in the actions taken by the prosecutors, their actions could be termed “prosecutorial'conduct” or “misconduct” although the parties engaging in the misconduct were not actually lawyers. On the other hand, such factors could simply be matters of governmental misconduct which should be addressed, as they were, during trial on the issue and defense of entrapment.
 

 
 *938
 
 After the pre-trial hearings, I made the decision not to dismiss the indictments on the alleged grounds of governmental misconduct because there was an insufficient showing of misconduct and because misconduct appeared, if at all,
 
 after
 
 the fact of the defendants’ willing, even eager, participation in the criminal scheme. Now, after the trial and the multitude of disclosures that I have forced the ATF to make, I still see the case as one which turns on a jury’s consider-ation of the classic entrapment defense rather than one which should be dismissed because of governmental misconduct in the prosecution.
 

 Certainly there was misconduct. Government employees and agents have taken a solemn oath and have taken it lightly. Government agents assisting the Court and its officers (particularly AUSA Bernard McLendon) have at a minimum made it difficult for the prosecutor to comply with both the letter and spirit of the
 
 Brady
 
 court’s directions. However, as mentioned earlier, these defendants who pled entrapment have admitted the underlying acts alleged in the indictments and have virtually convicted themselves in hour after hour of magnetic tape recordings of their own conversations. Were it not for the government’s misconduct, a stronger case could hardly be desired by a prosecutor.
 

 Most of the governmental misconduct occurred
 
 after
 
 the fact. The only real question that arises
 
 ab initio
 
 is whether the agents had any business in Augusta, Georgia, in the first place. Where there is governmental misconduct of the degree that we have experienced in this case, it should be considered by a jury on a “classic” entrapment defense and should not require a district court to dismiss indictments.
 

 Frivolousness determination
 

 Having denied defendants’ motion predicated upon a double jeopardy claim, the task presently before the Court is to determine whether the motion was frivolous or nonfrivolous.
 
 United States v. Dunbar,
 
 611 F.2d 985, 988 (5th Cir. 1980) (en banc).
 

 In
 
 Dunbar,
 
 the Fifth Circuit sought to strike a balance, under the divestiture of jurisdiction rule, between the need for appellate review of a colorable double jeopardy claim before commencement of trial so as to preclude an infringement of the accused’s constitutional rights and the necessity of maintaining a smooth and efficient functioning of the judicial process. In accordance with this balance, the court of appeals outlined the procedure district courts should follow in denying a double jeopardy motion:
 

 [T]he district courts, in any denial of a double jeopardy motion, should make written findings determining whether the motion is frivolous or nonfrivolous. If the claim is found to be frivolous, the filing of a notice of appeal by the defendant shall not divest the district court of jurisdiction. If nonfrivolous . . . the trial cannot proceed until a determination is made of the merits of an appeal.
 

 611 F.2d at 988.
 

 While the
 
 Dunbar
 
 court did not define the applicable standards in making the frivolousness determination, Judge Roney indicated that the district court may be guided by the same standards applied in denying leave to appeal
 
 in forma pauperis if
 
 an appeal is frivolous.
 
 Id.
 
 In considering the appropriate standard, this Court stated in another proceeding:
 

 Frivolity in the context of
 
 in forma pauperis
 
 proceedings was considered by the Fifth Circuit in
 
 Watson v. Ault,
 
 525 F.2d 886 (5th Cir. 1976). Citing
 
 Anders v. California,
 
 386 U.S. 738 [87 S.Ct. 1396, 18 L.Ed.2d 493] (1967), in which the Supreme Court defined a frivolous appeal in a criminal case as being one without arguable merit, the
 
 Watson
 
 court concluded that “this same test or standard should be applied in the trial court but in terms of the arguable substance of the claim presented, both in law and in fact.” 525 F.2d 892. The Fourth Circuit expanded upon this definition, holding that “[t]o satisfy the test of frivolousness ... it is . . . essential ... to find ‘beyond doubt’ and under any ‘arguable’ construction, ‘both in law and in fact' of the substance
 
 *939
 
 of the plaintiff’s claim that he would not be entitled to relief.”
 
 Boyce v. Alizaduh,
 
 595 F.2d 948, 952 (4th Cir. 1979). Thus, an adverse determination on the merits or the failure to make a prima facie showing by no means renders a motion frivolous.
 

 United States v. Bizzard,
 
 493 F.Supp. at 1086.
 

 Here, the Court has thoroughly reviewed defendants’ double jeopardy claim and has reached an adverse determination on the merits. Yet, the double jeopardy motion based upon the following grounds: (a) same offense; (b) collateral estoppel; and (c) prosecutorial misconduct, cannot be termed frivolous. The Court cannot find beyond doubt and under any arguable construction, both in law and in fact of the substance of the claim that there would be no entitlement to relief. Certainly, the legal points are at least arguable on their merits.
 

 Accordingly, in adherence to the directive of the
 
 Dunbar
 
 court, the Court finds defendants’ double jeopardy motion nonfrivolous.
 

 [1]
 

 . At least one district court has concluded that the
 
 Hardwick-Jackson
 
 balancing analysis did not survive the Supreme Court ruling in
 
 Bordenkircher v. Hayes,
 
 434 U.S. 357, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978).
 
 United States v. Walker,
 
 514 F.Supp. 294 (E.D.La.1981). Chief Judge Heebe premised his opinion on dicta that “a balancing test to determine whether a showing of actual or merely apprehended vindictiveness would be required, may be substantially undermined by . . .
 
 Bordenkircher." United States v. Thomas,
 
 617 F.2d 436, 438 n. 1 (5th Cir. 1980). While Chief Judge Heebe presents an excellent analysis of the prosecutorial vindictiveness claim in a
 
 post-Bordenkircher
 
 setting, and may very well presage a change in Fifth Circuit dogma, this Court will leave it to the Supreme Court to overrule the mandate of
 
 Blackledge
 
 and its progeny.
 

 [2]
 

 . Both the government and the defendants make much over whether the government is estopped from contesting the “fact” of entrapment for the “not guilty” counts or whether the government is estopped from introducing evidence concerning certain alleged overt acts and certain coconspirators’ statements. On proper motion in limine, the Court will decide these issues before retrial.
 

 [3]
 

 . The collateral estoppel effect is generated, if at all, by the counts upon which the jury was able to reach a unanimous verdict. Since no verdict was reached and no factual determination was made with respect to the hung counts, those counts, in and of themselves, do not have an issue-preclusion consequence.
 
 See United States v. Larkin,
 
 611 F.2d 585, 586 (5th Cir. 1980) (on rehearing).
 

 [4]
 

 . The right of the jury to base its verdict of acquittal on confusion, mistake, compromise or leniency,
 
 see United States v. Espinosa-Cerpa,
 
 630 F.2d at 332, is not a factor in applying collateral estoppel. As the Second Circuit commented in
 
 Mespoulede, supra :
 

 [T]he possibility that the jury acquitted out of a desire to compromise or to show mercy, or from “simple frustration after hours of tedious debate,” is not a basis for refusing to apply collateral estoppel. A contrary rule would, of course, eviscerate the doctrine altogether, for no one who is not present during the jury’s deliberations can ever know precisely how the jury reached its verdict.
 

 United States v. Mespoulede,
 
 597 F.2d at 333 n.7 (citations omitted);
 
 see United States v. Leach,
 
 632 F.2d at 1341 n.12 (”[I]f we consider jury nullification [i.e. the right of a jury to acquit for whatever reason] as a basis on which the jury might have acquitted [defendant] we would in effect be eliminating the entire doctrine of collateral estoppel.”).
 

 [5]
 

 . It should be remembered that, in response to a jury question of October 2, 1981, the Court instructed the jury as follows:
 

 You should consider the issue of entrapment separately as to each charge against each of the named defendants. Should you determine as to any count that one or more of the three named defendants was the victim of entrapment, that does not necessarily mean that all were. Likewise, if you determine as to any count that one or more of the named defendants was
 
 not
 
 the victim of entrapment, that does not necessarily mean that all were
 
 not.
 
 In short, you must consider the issue of entrapment as to each count of each indictment against each of the three named defendants on a separate, and individual basis.
 

 [6]
 

 . Able defense counsel have assiduously pursued a defense of entrapment in these cases. This defense has been deployed in the “classic” sense, that is, before the jury, and in a nonstandard way — by seeking dismissal of the indictments on grounds of governmental misconduct amounting to entrapment “as a matter of law.” In these proceedings, the mention of “entrapment” and the conduct of the government investigators has been so frequent that it almost obscures the purpose of the prosecution — to determine the innocence or guilt of the defendants. It is true that some conduct of the investigators was poor, even reprehensible. However, these same investigators have also shown themselves to be effective, innovative and remarkably diligent in their seamy assignment. This was an undercover operation. The investigators had weekly, sometimes daily, association with the defendants. Had their conduct been more responsible (and less like that of a criminal), perhaps the defendants would have been tipped off to their true designs. An informant (here euphemistically titled “special
 
 *935
 
 employee”) is not likely to be a model of purity. On the contrary, the opposite is to be expected. Under the magnified examination achieved at trial, some of the actions of the investigators appears unsavory. There is no excuse for a conscious misstatement of fact. It shatters credibility, an irreplaceable element in a case of this type. It is noted also that the seriously questionable statement of Mr. Peacock about his income tax returns does not directly relate to this prosecution. It bears on credibility but is ancillary. Most certainly, the perpetrator of any misdeed will be called to answer when this matter is closed. The success of the entrapment defense will not serve to discipline errant investigators. Neither would a conviction absolve them. The agents and investigators are not on trial, the defendants are.
 

 During this marathon litany of “governmental misconduct, prosecutorial overreaching and vindictiveness,” little is heard of the defendants’ acts and deeds. From them much relating to the activities of the investigators can be told. It would serve no useful purpose to review the conduct of the investigators only. Such a task, without the accompanying context of the defendants activities, would be unrealistic and false. See
 
 United States v.
 
 Tobias, 662 F.2d 381, at 387 (5th Cir. 1981) (“The cases demonstrate that outrageous involvement turns upon the
 
 totality of the circumstances
 
 [,
 
 as well the parts that make up the whole,]
 
 with no single factor controlling.”). Accordingly, some brief mention of what the evidence at the first trial showed this Court is appropriate, and these facts are stated as findings to the extent that they are required or necessary on review.
 

 When contacted by the investigators, these three defendants reacted as follows: (a) Mulherin was guarded but willing to talk about marihuana and cocaine, his willingness was expressed under very suspicious circumstances after Mr. Peacock had inquired about the security of the telephone line; (b) Hornsby was ignorant of means to assist Mr. Peacock in his quest for illegal weapons, but he was ready and willing to search and report back; (c) Holliday, initially enlisted by Hornsby, was willing to aid in the search for illegal weapons and did so with success on short notice. Mr. Peacock’s first contact with Mr. Hornsby and Mr. Mulherin was by telephone. After the first personal meeting with the defendants, all of them were eager, and at some times aggressive in their pursuit of his proposed scheme.
 

 To be sure, the investigators bought a lot of liquor for everyone, and piecemeal explosives and firearms purchases were arranged to keep the operation going. Often during the undercover operation, the investigators would play one defendant against the other, and they thereby developed some rivalry within the conspiracy itself, and between the “entrapment defendants.” These three defendants acted without hesitation to procure easily convertible weapons, to modify those weapons to a full automatic, illegal capability, and to sell them to a party whom they verily believed to be in the business of distributing drugs on a large scale. They obtained weapons, applied their knowledge, and manufactured machine guns without even a second thought for the death, despair, or disfigurement which those hideous devices could cause if they reached their ostensible destination in the hands of some drug distributor or revolutionary “colonel” in South or Central America.
 

 Likewise, these defendants, after some thought and consideration, readily accepted and then stated their preference at the prospect of receiving payment for the machine guns and explosives in cocaine and marihuana instead of cash money. One convicted conspirator, Elizabeth Moore, age 19, was brought in at the behest of defendant Mulherin as the “cocaine tester.” The investigators carefully avoided delivering any cocaine to her or anyone else during the operation. Many comments were made during the tape-recorded conversations which alluded to youthful distributors and users of the much sought after cocaine and marihuana. These defendants never stated their abhorrence, reluctance, or even a reservation about dealing in controlled substances in exchange for the machine guns and explosives. These defendants’ discussions of the barter of body rending devices for mind destroying substances were casual and remorseless. It is hard to conjure a more nefarious scheme. The defendants have implicated themselves in these cases in hour after hour of their own cumulative statements on tape. Apart from the “misconduct” of government investigators, a better case could hardly be desired by a prosecutor. Beneath exteriors of affability, respectability, and businesslike calm, these defendants have demonstrated their willingness to enlist in the lowest ranks of crime. Their defense is that the police are lower than they.
 

 Given more innocence on the part of the defendants, it is conceivable that these cases could be disposed of on a theory of entrapment as a matter of law. However, innocence is scarce. A balancing or an assessment of the misdeeds of the defendants against those of the police is required. Accordingly, this case is moreover one for decision by a jury and not a judge alone.